Filed 9/11/14  J.M. v. Super. Ct. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| J.M. et al.,<br><br>      Petitioners,<br><br>      v.<br><br>THE SUPERIOR COURT OF SANTA CRUZ COUNTY,<br><br>      Respondent,<br><br>SANTA CRUZ COUNTY HUMAN SERVICES DEPARTMENT,<br><br>      Real Party in Interest. | H041083<br>(Santa Cruz County<br>Super. Ct. No. DP002844) |

## I.  INTRODUCTION

J.M. is the mother of M.M., the child at issue in this juvenile dependency case. The mother has filed a petition for extraordinary writ seeking review of the juvenile court's order terminating reunification services and setting a Welfare and Institutions Code section 366.26[1] permanency planning hearing.  The mother has also filed a number of supplemental writ petitions.  In her writ petitions, the mother contends the juvenile

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

court erred by asserting jurisdiction over the child, by bypassing reunification services, and by committing a variety of procedural errors.

L.M., the maternal grandmother of the child, has also filed a petition for extraordinary writ and several supplemental writ petitions.[2] She repeats many of the claims of error asserted by the mother, and she contends that the juvenile court erred by denying her section 388 petitions and her request for de facto parent status.

For reasons that we will explain, we will deny the mother's and maternal grandmother's writ petitions. The mother has also filed a petition for writ of habeas corpus, which we ordered considered with her petition for extraordinary writ. We have disposed of the mother's habeas petition by separate order issued this day.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Section 300 Petition*

On January 16, 2014, the Santa Cruz County Human Services Department (the Department) filed a petition under section 300, subdivisions (b) [failure to protect] and (g) [no provision for support], alleging that the child came within the jurisdiction of the juvenile court.[3] The child was less than one month old at the time. The petition alleged the following facts.

The mother had been incarcerated in Monterey County jail since she was two weeks pregnant, and she remained in jail. The mother was incarcerated due to "felony DUI charges and her involvement in an accident in 2011 in which she crashed into [a] motorcyclist causing the victim great bodily injury." The mother anticipated being

---

[2] After requesting and receiving an extension of time from this court, the maternal grandmother submitted her initial writ petition one day late. In the exercise of its discretion, this court will permit her initial writ petition and her subsequent writ petitions to be filed.

[3] A first amended section 300 petition was filed on February 11, 2014.

sentenced to a one and a half year prison term, which she would serve at Chowchilla State Prison, where she hoped to participate in a program allowing infants to remain with their mothers. The mother had a history of substance abuse and multiple arrests for "substance-related charges."

The mother had entrusted the maternal grandmother to care for the child while the mother was incarcerated, but on January 14, 2014, the maternal grandmother had turned herself in to the Santa Cruz County jail. The maternal grandmother had an outstanding warrant for possession of stolen property. The maternal grandmother had a history of substance abuse, and she had prior arrests for hit and run with property damage, possession for sale of a controlled substance, and possession of narcotics paraphernalia. The maternal grandmother and her partner had been "involved in a kidnapping involving a boat and the coastguard," and she had been arrested on charges of grand theft and conspiracy. The maternal grandmother had turned herself in "because she had not been able to get Medi-Cal for the baby and seemed to believe that once she cleared up the warrant she would qualify for Medi-Cal."[4]

The alleged father, N.L., had a last known address in San Francisco. He had a history of substance abuse and had been arrested multiple times for "substance-related charges." He had two felony convictions for transporting and selling controlled substances.[5]

When the maternal grandmother turned herself in to jail, the child was taken into protective custody. By the time the petition was filed, the child was in foster care.

---

[4] The maternal grandmother claims she went to the jail only to sign a promise to appear, not to turn herself in.

[5] A second amended section 300 petition, filed on March 11, 2014, also named S.K. as an alleged father. On May 30, 2014, the court found that S.K. was not the child's father.

### B.     Detention Hearing

At the detention hearing held on January 17, 2014, the juvenile court appointed counsel for the child and the mother.  The court found that continuance in the home of the parent or legal guardian would be contrary to the child's welfare and that removal was necessary to protect the child's physical or emotional health.  The court therefore determined that a prima facie showing had been made that the child came within section 300, and it ordered the child detained.

The court further found that visitation between the mother and child would be detrimental while the mother was in custody, unless the mother was allowed contact visits.

### C.     Maternal Grandmother's First and Second Section 388 Petitions and De Facto Parent Statement

On February 14, 2014, the maternal grandmother filed a section 388 petition, requesting the child be returned to her care.[6]  The maternal grandmother claimed the allegations about her involvement in a kidnapping and swimming away from the Coast Guard were not true.

On the same date, the maternal grandmother filed a De Facto Parent Statement (Judicial Council form JV-296) on behalf of herself and her partner, D.M.  She stated that the child had lived with her between December 27, 2013 and January 14, 2014.  She described how she had spent 24 hours per day with the child, the activities she did with the child, and the things she had purchased for the child.

---

[6] Pursuant to section 388, subdivision (a)(1), "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

On March 14, 2014, the maternal grandmother filed a second section 388 petition, requesting the court dismiss the case. The maternal grandmother represented that she was out of custody on formal probation. She asserted that the social workers had lied and that the "Public Defenders are incompatant [*sic*]." She further asserted that the child was unhappy in her foster home placement. The maternal grandmother attached a letter from the Department explaining that the child had not been placed with her because she was on felony probation.

### D.    *Jurisdiction/Disposition Report*

The Department's jurisdiction/disposition report, filed on April 10, 2014, recommended that the mother not be offered reunification services. The Department requested the court find, pursuant to section 361.5, subdivision (e)(1), that reunification services would be detrimental to the child because the mother was incarcerated.[7]

The social worker had spoken with a correctional counselor and the mother's criminal attorney. The mother appeared to be eligible to participate in the Community Prisoner Mother Program at state prison. The mother would likely serve about three years in prison. Based on the length of her sentence and the lack of any parent-child bonding, the Department recommended that reunification services not be offered. The mother had not visited with the child because Monterey County jail did not offer contact visits.

---

[7] Section 361.5, subdivision (e)(1) provides, in pertinent part: "If the parent or guardian is incarcerated, . . . the court shall order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the child. In determining detriment, the court shall consider the age of the child, the degree of parent-child bonding, the length of the sentence, the length and nature of the treatment, the nature of the crime . . . , the degree of detriment to the child if services are not offered and, for children 10 years of age or older, the child's attitude toward the implementation of family reunification services, the likelihood of the parent's discharge from incarceration . . . within the reunification time limitations described in subdivision (a), and any other appropriate factors."

The child remained in a foster home. The Department had contacted a number of relatives to determine if there were any alternative placement options. The maternal great aunt indicated she was willing to be considered for short-term placement.

### E. Maternal Grandmother's Third and Fourth Section 388 Petitions; Department's Memos

On April 15, 2014, the maternal grandmother filed a third section 388 petition. She complained that neither she nor the mother had been present at a February 11, 2014 hearing when the juvenile court received a report from the Department. The maternal grandmother repeated her allegations that the social workers had lied, and she complained that the child had been placed out of the county.

On May 22, 2014, the Department filed a memo regarding relative placement. The child had been placed with maternal relatives in a concurrent home (a home where the foster parents are the potential adoptive parents) in San Diego County. The Department explained it was not recommending placement of the child with the maternal grandmother and her partner based on its assessment of the factors listed in section 361.3.[8] The memo reviewed the maternal grandmother's criminal history and the

---

[8] Section 361.3, subdivision (a) provides: "In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative, regardless of the relative's immigration status. In determining whether placement with a relative is appropriate, the county social worker and court shall consider, but shall not be limited to, consideration of all the following factors: [¶] (1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs. [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶] (3) The provisions of Part 6 (commencing with Section 7950) of Division 12 of the Family Code regarding relative placement. [¶] (4) Placement of siblings and half siblings in the same home, if that placement is found to be in the best interest of each of the children as provided in Section 16002. [¶] (5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect. [¶] (6) The nature and duration (continued)

6

maternal grandmother's history of referrals to the Department for her own children. The memo also reviewed the criminal history of the maternal grandmother's partner, who had numerous arrests for various offenses as well as convictions for burglary, being under the influence of a controlled substance, and disorderly conduct.

On May 30, 2014, the Department filed a memo regarding updated information. The Department reiterated its recommendation that the mother not be offered reunification services under section 361.5, subdivision (e)(1), and it also recommended bypass of reunification services pursuant to section 361.5, subdivisions (b)(12) and (b)(13).[9] The Department noted that the mother had been convicted of felony driving while intoxicated, with an allegation that she inflicted great bodily injury pursuant to Penal Code section 12022.7, subdivision (a). The Department further noted that the

---

of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful. [¶] (7) The ability of the relative to do the following: [¶] (A) Provide a safe, secure, and stable environment for the child. [¶] (B) Exercise proper and effective care and control of the child. [¶] (C) Provide a home and the necessities of life for the child. [¶] (D) Protect the child from his or her parents. [¶] (E) Facilitate court-ordered reunification efforts with the parents. [¶] (F) Facilitate visitation with the child's other relatives. [¶] (G) Facilitate implementation of all elements of the case plan. [¶] (H) Provide legal permanence for the child if reunification fails. [¶] . . . [¶] (I) Arrange for appropriate and safe child care, as necessary. [¶] (8) The safety of the relative's home. . . ."

[9] Under section 361.5, subdivision (b)(12), reunification services need not be provided to a parent when the court finds, by clear and convincing evidence, "[t]hat the parent or guardian of the child has been convicted of a violent felony, as defined in subdivision (c) of Section 667.5 of the Penal Code."

Under section 361.5, subdivision (b)(13), reunification services need not be provided to a parent when the court finds, by clear and convincing evidence, "[t]hat the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible."

7

mother had been using drugs for about 10 years and that she had multiple convictions for drug-related crimes. In 2005, the mother had been ordered to complete outpatient substance abuse program as part of a diversion program. She was subsequently arrested for drug-related offenses on two occasions and did not complete the program. She was terminated from diversion and, later, from a Proposition 36 program. Between 2010 and 2013, she was convicted of six drug-related offenses and probation violations.

On June 6, 2014, the maternal grandmother filed a fourth section 388 petition. The maternal grandmother alleged that at a hearing on June 4, 2014, the trial court had informed her that she was not a party to the case and could not have access to the case file. The minutes for the June 4, 2014 hearing indicate that on that date, the mother had not been transported and therefore the court continued the jurisdiction/disposition hearing and the hearing on the maternal grandmother's pending motion for de facto parent status and her pending section 388 petitions.

### F. *Jurisdiction/Disposition Hearing*

A jurisdiction/disposition hearing was held on June 6, 2014, along with a hearing on the maternal grandmother's motion for de facto parent status and her section 388 petitions.

Counsel for the child indicated she was in agreement with the Department's recommendations regarding jurisdiction, bypass of reunification services, and denial of the maternal grandmother's motion and petitions. Counsel for N.L., the alleged father, stated that she had not been able to contact N.L. for "some time" and did not know whether he had taken a paternity test.

Social worker Erin Burton testified on behalf of the Department and was accepted as an expert in risk assessment of dependent children. Burton opined that the mother had a history of substance abuse that she had not addressed through treatment, which posed a risk of harm to the child. Burton opined that reunification services should be bypassed because the child had no relationship with the mother and because the mother was going

8

to be incarcerated for a significant period of time. Burton noted that the mother would have limited access to substance abuse treatment services while incarcerated. Further, providing the mother with reunification services (i.e., visitation) would require moving the child from her concurrent placement, where she was bonding with her caregivers and cousins. Burton had spoken to someone with the prison's inmate infant program. It would be "very, very difficult for the mother to get into the program" because she was going to be transferred to Folsom State Prison.

The maternal grandmother testified that she had cared for the child from the time the child was two days old until she was remanded into custody on January 14, 2014. She had brought the child with her when she turned herself in because she expected to be released on her own recognizance.

The mother testified that she had been given an opportunity to participate in substance abuse during her criminal proceedings in 2006, but she had opted to work and "tak[e] a felony instead." She had not been offered any other substance abuse treatment opportunities. She had been clean at various times, but she had also relapsed. She had been in and out of custody. She was currently incarcerated at Folsom State Prison. She had applied for the mother/infant program in Corona, but she did not know if she could get into the program. She expected to be in prison for another year and a half. At Folsom State Prison, she had enrolled in every substance abuse program she was eligible for. She had also applied for an alternative custody program. If she was not accepted into the mother/infant program, she wanted the child to stay with her aunt and she wanted her aunt to become the child's guardian.

Social worker Victoria Williams testified for the Department as a rebuttal witness and as an expert in risk assessment of dependent children and in assessment of permanent placement. Williams had become concerned about the mother's claim of sobriety after she interviewed N.L. in April of 2014. Williams did not think that placement in an inmate child program was in the child's best interest, because the child was attaching to

9

her current caregivers and because of concerns about the mother's ability to stay clean and sober.

The mother submitted information about the Community Prisoner Mother Program run by the California Department of Corrections. The information indicates that the program permits qualified applicants to live with their children "in a public or privately supervised center away from the prison setting." The program offers counseling, parenting classes, and substance abuse counseling and treatment.

The maternal great aunt, who was the child's caregiver, submitted a letter in support of the mother's request to have the child in "a mother infant program." The maternal great aunt indicated she would give the mother "help and support" upon her release from prison.

### G. *Juvenile Court Findings and Orders*

At the end of the June 6, 2014 hearing, the juvenile court took jurisdiction after finding all of the allegations of the first amended petition true. The court found true the allegations under section 300, subdivisions (b) and (g) and adjudged the child a dependent of the court.

Regarding disposition, the court ordered that no reunification services be provided to the mother. First, the court found that under section 361.5, subdivision (b)(12), the mother had been convicted of a violent felony. Second, the court found that under section 361.5, subdivision (b)(13), the mother had a history of extensive, abusive, and chronic drug or alcohol use and had resisted prior court-ordered treatment or had failed or refused to comply with treatment. Third, the court found that under section 361.5, subdivision (e)(1), the mother was incarcerated and reunification services would be detrimental to the child. The court set a selection and implementation hearing for October 2, 2014.

The Department noted that if the mother became eligible for a child/parent program before that date, she could file a section 388 petition. The juvenile court

10

encouraged the mother to try to get into such a program and indicated the court would "take another bright look at this" if she was successful.

The juvenile court next turned to the maternal grandmother's pending motions. The court noted that the maternal grandmother had become disruptive earlier in the proceedings and had voluntarily left the courtroom. The court then denied the maternal grandmother's section 388 petitions, finding them factually unsupported. The court also denied the maternal grandmother's request for de facto parent status. The court found that although the maternal grandmother had cared for the child for 20 days, "that was not a substantial period." Further, the court found that the maternal grandmother would not be an appropriate candidate for de facto parent status because of her criminal history and drug use, which was documented by the Department and referenced in a letter from the mother.

### H. Writ Petitions

Both the mother and maternal grandmother filed notices of intent to file writ petitions.

The mother filed her initial writ petition on July 14, 2014. On July 24, 2014, the mother filed a supplemental petition for extraordinary writ.

The maternal grandmother requested an extension of time in which to file her writ petition, and this court granted the extension to July 21, 2014. On July 22, 2014, this court received the maternal grandmother's writ petition. On July 31, 2014, this court received two supplemental writ petitions from the grandmother, which we will also consider.

The Department filed a letter brief opposing the mother's writ petition on August 8, 2014. The Department noted that neither the mother nor the grandmother had served any petitions on the Department, but that this court had e-mailed the Department

11

two of the mother's writ petitions. The Department therefore addressed only those petitions in its letter brief.[10]

On August 18, 2014, the maternal grandmother filed a motion to augment the record, which included the following material: (1) a letter from the maternal grandmother to the trial court dated March 14, 2014; (2) the maternal grandmother's objections and corrections to the investigation report; (3) the maternal grandmother's objections and corrections to the jurisdiction/disposition report; (4) the maternal grandmother's declaration in support of terminating jurisdiction; (5) a media story about how the maternal grandmother and her boyfriend were released without being charged in connection with the sailboat incident; and (6) a media story about a Florida kidnapping involving a sailboat. The motion to augment is granted. We have considered those materials.

## III.    DISCUSSION

### A.    The Mother's Contentions

The mother first claims the juvenile court erred by asserting jurisdiction over the child because the allegations of the petition are untrue. The mother contends that she had made arrangements for the maternal grandmother and the maternal uncle to care for the child, but when the maternal grandmother turned herself in on January 14, 2014, the sheriff's department did not allow the maternal grandmother to contact the maternal uncle to come pick up the child.

"At the jurisdictional hearing, the dependency court's finding that a child is a person described in section 300 must be supported by a preponderance of the evidence.

---

[10] On August 18, 2014, the maternal grandmother attempted to file a reply to the Department's letter brief, on behalf of the mother. We decline to permit the filing of that reply because the maternal grandmother, "who is not an attorney, cannot represent another party in the action." (See *Evans v. Evans* (2008) 162 Cal.App.4th 1157, 1162, fn. 1.)

[Citations.] We review the dependency court's jurisdictional findings for substantial evidence, and review the evidence in the light most favorable to the dependency court's findings and draw all reasonable inferences in support of those findings. [Citation.]" (*In re John M.* (2013) 217 Cal.App.4th 410, 418.)

Here, pursuant to section 300, subdivision (b), the Department had alleged that the child was at risk of serious harm because (1) the mother failed to arrange for safe and suitable care of the child during her incarceration, (2) the mother failed to protect the child from the maternal grandmother, whose "history of substance abuse and reckless behavior placed [the child] at risk of physical harm," and (3) the mother's own "ongoing, unresolved substance use" placed the child at substantial risk of serious physical harm.[11] Pursuant to section 300, subdivision (g), the Department had alleged that the mother was "incarcerated and unable to arrange for appropriate care of her child."[12] The juvenile court sustained the allegations under section 300, subdivisions (b) and (g).

---

[11] Section 300, subdivision (b)(1) provides that jurisdiction may be taken if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" four circumstances: "[1] the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or [2] the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or [3] by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or [4] by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

[12] Section 300, subdivision (g) provides that jurisdiction may be taken under four circumstances: "[1] The child has been left without any provision for support; [2] physical custody of the child has been voluntarily surrendered . . . ; [3] the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child; or [4] a relative or other adult custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child, the whereabouts of the parent are unknown, and reasonable efforts to locate the parent have been unsuccessful."

Below, the mother cited *Maggie S. v. Superior Court* (2013) 220 Cal.App.4th 662 (*Maggie S.*), where the mother similarly gave birth to the child while incarcerated and similarly claimed the juvenile court erred in taking jurisdiction over the child pursuant to section 300, subdivisions (b) and (g) because she had made arrangements for the child's care. (*Id.* at p. 664.) In *Maggie S.,* the mother had identified the child's godmother as a prospective placement for the child, and the godmother was initially willing to care for the child, but the Department did not inform the court of this possible arrangement at the time of the jurisdiction hearing. Because there was no substantial evidence that placement of the child with the godmother would present a serious risk of physical harm to the child and because the mother had made arrangements for the child's care, the juvenile court erred by taking jurisdiction under section 300, subdivisions (b) and (g). (*Maggie S., supra,* at p. 673.)

As the juvenile court found, the instant case is distinguishable from *Maggie S.* Here, although the mother made arrangements for the child to be cared for by the maternal grandmother, substantial evidence supports the court's finding that such placement presented a serious risk of physical harm to the child. First, as noted in the Department's memo regarding relative placement, the mother knew that the maternal grandmother had a warrant for her arrest and thus that the child could be left without a caretaker at any time. Second, the mother knew that the maternal grandmother had a criminal history and a history of substance abuse. Attached to the Department's memo regarding relative placement was a letter from the mother to the maternal grandmother dated February 4, 2014. In the letter, the mother advised the maternal grandmother to "quit drugs completely" and that God did not want to "subject" the child to the "hard lifestyle" that the maternal grandmother lived. "The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.) When a child is "of 'tender years,' " evidence of substance abuse by the parent or guardian " 'is prima

14

facie evidence of the inability of [the] parent or guardian to provide regular care resulting in a substantial risk of harm.' [Citations.]" (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219.)

Because the mother was incarcerated and had arranged for the child to be cared for by the maternal grandmother, who was at risk of being incarcerated herself while caring for the child and who was a known drug user, substantial evidence supports the trial court's determination that it was appropriate to take jurisdiction over the child pursuant to section 300, subdivision (b).

We observe that there is some conflict in the case law regarding the requirements for jurisdiction under section 300, subdivision (g) based on an allegation that "the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child." Some courts have interpreted this provision as inapplicable when the parent can arrange for the child, even if the arrangement is not suitable. (See, e.g., *In re S. D.* (2002) 99 Cal.App.4th 1068 (*S. D.*); *Maggie S., supra,* 220 Cal.App.4th at p. 673.) Other courts have interpreted this provision as permitting the court to take jurisdiction based on a finding that the incarcerated parent is not "able to make *suitable* arrangements for his or her children's care." (*In re Aaron S.* (1991) 228 Cal.App.3d 202, 212, italics added; see also *In re Monica C.* (1994) 31 Cal.App.4th 296, 305.) Because we have already found that substantial evidence supports the juvenile court's determination of jurisdiction under section 300, subdivision (b), we need not reach the issue of whether the evidence also supports the court's decision to take jurisdiction under section 300, subdivision (g).

The mother's second claim is that the sheriff's department conspired with the social worker to mislead the maternal grandmother into believing she would be released on her own recognizance and to seize the child despite no signs of abuse or neglect. The mother quotes the following language from *S. D., supra,* 99 Cal.App.4th at page 1077: "There is no 'Go to jail, lose your child' rule in California. [Citation.]" Thus, it appears mother is challenging the jurisdictional findings. As explained above, substantial

15

evidence supports the juvenile court's decision to take jurisdiction of the child under section 300, subdivision (b).

The mother's third claim is that the juvenile court erred by having a jurisdictional hearing on February 11, 2014 without the presence of the mother, the mother's counsel, or a court reporter. The record does not support this claim. The jurisdictional hearing was held on June 6, 2014, not February 11, 2014. While the clerk's minutes state that the February 11, 2014 proceeding was "Jurisdictional Hearing/Receipt of Report" (capitalization omitted), the minutes further reflect that the only thing that occurred on that date was that the jurisdictional report was "received and lodged by the Court." The clerk's minutes reflect that the next court date would be for the setting of the jurisdictional hearing.

The mother's fourth claim is that her due process rights were violated at the June 6, 2014 jurisdiction/disposition hearing because she had no opportunity to be heard, to call witnesses, to present evidence, or to cross-examine witnesses. The record does not support this claim. The mother testified at the jurisdiction/disposition hearing, and the maternal grandmother testified on her behalf. The mother presented documentary evidence concerning the Community Prison Mother Program as well as a letter from her aunt, the child's caretaker. The mother's trial counsel cross-examined the Department's witnesses.

The mother's fifth claim is that the juvenile court should have appointed a guardian ad litem. The mother did not raise this claim below, and she does not cite any authority for this claim. To the extent she is claiming the child should have had a guardian ad litem, we note that "[f]or dependency proceedings, counsel that is appointed for a minor serves as the child's guardian ad litem. [Citations.]" (*In re Cole C.* (2009) 174 Cal.App.4th 900, 910; see also *In re Charles T.* (2002) 102 Cal.App.4th 869, 879 (*Charles T.*).) Here, the child was represented by separate appointed counsel throughout the proceedings. Nothing in the record indicates that a separate guardian ad litem should

16

have been appointed.  (See *Charles T., supra,* at p. 879 ["in cases where the minor's counsel discovers interests of the minor outside the dependency which may result in separate *adversarial* proceedings, the court will be required to appoint a separate guardian ad litem"].)  Later in her petition, the mother states that a CASA (California Appointed Special Advocate) should have been appointed for the child.  Again, no such claim was raised below, and the mother provides no authority to support this argument.  The mother cites "In re Miguel S. (2005) 137 CAL APP 4th," but we find no case called *In re Miguel S.* in volume 137 of the California Appellate Reports, Fourth Series.

The mother's sixth claim is that the juvenile court erred by failing to get an express waiver from the mother when she waived the reading of the petition, the amended petitions, and the advisement of rights.  The record does not support this claim.  Because the mother was not present at the detention hearing held on January 17, 2014, the court reserved "the issue of reading and advisement" of the petition.  The mother was present at the February 18, 2014 hearing, when the "[r]eading and advisement of the [first amended] Petition" was waived.  The mother was also present at the March 17, 2014 hearing, when the "[r]eading and advisement of the [second amended] Petition" was waived.

The mother's seventh claim is that the juvenile court did not provide the mother with the opportunity to be present at all hearings.  The mother states she was only transported to five out of 12 hearings.  The record shows that the mother was personally present at many hearings, including the jurisdiction/disposition hearing, and she was represented by counsel at all other hearings.  The mother, who was incarcerated, did not have the right to be present at all hearings.  (See *In re Jesusa V.* (2004) 32 Cal.4th 588, 599 [other than hearing on termination of parental rights, an incarcerated parent's presence is not mandatory; other hearings may " 'proceed without attendance by the prisoner-parent' "].)

17

The mother's eighth claim is that the juvenile court erred by assuming jurisdiction over the child without proof that the child had suffered any risk of serious illness or injury. As explained above, substantial evidence supports the juvenile court's decision to take jurisdiction of the child under section 300, subdivision (b).

The mother's ninth claim is that the Department fraudulently stated that the maternal grandmother had been the subject of prior dependency cases. The mother points to nothing in the record supporting this claim. Moreover, as explained above, even without evidence that the grandmother had been the subject of prior referrals to the Department, substantial evidence supports the juvenile court's decision to take jurisdiction of the child under section 300, subdivision (b).

The mother's tenth claim is that the juvenile court erred by reading the dispositional report prior to the jurisdiction hearing. The mother cites to "In re Gladys." We believe the mother is referring to *In re Gladys R.* (1970) 1 Cal.3d 855, which involved a section 600 proceeding (i.e., juvenile delinquency). In that case, the court held that "Welfare and Institutions Code sections 701, 702, and 706 prohibit the judge from reading the social report before the jurisdictional hearing. [Citation.]" (*Id.* at p. 860.) As this is a section 300 proceeding (i.e., juvenile dependency), we find no merit to the mother's claim.

The mother's eleventh claim is a repeat of her third claim: that the juvenile court erred by having a jurisdiction hearing on February 11, 2014 without the presence of the mother, the mother's counsel, or a court reporter. As noted above, the record does not support this claim. The February 11, 2014 proceeding involved only the juvenile court's receipt of the jurisdiction report.

The mother makes several additional claims in her supplemental petition.

First, the mother claims she was denied reunification services because of her conviction of DUI with bodily injury. To the extent she is challenging the court's finding that this was a violent felony, we note that pursuant to Penal Code section 667.5,

18

subdivision (c)(8), a " 'violent felony' " includes "[a]ny felony in which the defendant inflicts great bodily injury on any person other than an accomplice . . . ."

Second, the mother generally challenges the sufficiency of the evidence to support jurisdiction. As explained above, substantial evidence supports the juvenile court's decision to take jurisdiction of the child under section 300, subdivision (b).

Third, the mother challenges the denial of reunification services, citing *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450 (*Renee J.*). That case involved the denial of reunification services pursuant to section 361.5, subdivision (b)(10), which applies when the juvenile court has ordered "termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling." That provision is not applicable in this case and thus *Renee J.* does not support the mother's writ petition.

Fourth, the mother states that she wants her aunt to be the child's guardian. This will be an option the juvenile court may select at the permanency planning hearing. (See § 366.26, subd. (b); *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

### B.        *The Maternal Grandmother's Contentions*

Most of the maternal grandmother's claims repeat the mother's claims. As explained above, we find no merit to any of those claims. Moreover, the only claims that the grandmother may raise relate to the petitions and motion that she filed on her own behalf; she lacks standing to raise any issues on behalf of the mother. (See *In re Aaron R.* (2005) 130 Cal.App.4th 697, 704-705 (*Aaron R.*).)

There are a number of other procedural defects in the maternal grandmother's writ petitions. First, as previously noted, her petitions were not timely filed. (See fn. 2, *ante.*) Second, the maternal grandmother apparently did not serve a copy of any of her petitions on the Department. Third, to the extent she is challenging the denial of her section 388 petitions and her request for de facto parent status, such orders are generally reviewable by appeal, not writ. (See *Aaron R., supra,* 130 Cal.App.4th at pp. 702-703; *In re*

19

*Michael R.* (1998) 67 Cal.App.4th 150, 154; but see *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1317 [writ petition may be filed as to the denial of section 388 petition if an appeal is not an adequate remedy].) Despite these procedural defects, in the exercise of its discretion, this court will review the merits of the maternal grandmother's writ petitions. We therefore turn to the question of whether the trial court abused its discretion by denying the maternal grandmother's section 388 petitions and by denying the maternal grandmother's request for de facto parent status. (See *Aaron R., supra,* at pp. 705-706; *In re Merrick V.* (2004) 122 Cal.App.4th 235, 256 (*Merrick V.*).)

In her section 388 petitions, the maternal grandmother claimed the allegations about her involvement in a kidnapping and swimming away from the Coast Guard were not true, that the child was unhappy in her initial foster home placement, that she and the mother had not been present at the February 11, 2014 hearing, and that she had been denied access to case files. "In order to grant a petition pursuant to section 388, there must be a substantial change in circumstances regarding the child's welfare and the requested modification of the prior order must be in the child's best interests. [Citation.]" (*In re Heraclio A.* (1996) 42 Cal.App.4th 569, 577.) Here, the maternal grandmother did not make any showing of changed circumstances as to the problems that led to the child's removal. Moreover, nothing in the maternal grandmother's section 388 petitions overcame her ineligibility for placement based on her criminal history. (See § 361.4, subd. (d)(2).) Thus, the trial court did not abuse its discretion by denying her section 388 petitions.

We next turn to the question of whether the juvenile court abused its discretion by denying the maternal grandmother's request for de facto parent status. "Whether a person should be accorded de facto parent status depends on an assessment of the particular individual and the facts of the case. [Citation.] The court should consider the applicant's adherence to the role of a parent and whether he or she has information that would be helpful to the court in making its placement orders. [Citation.] Factors the

court should consider in assessing a de facto parent application are whether: '(1) the child is "psychologically bonded" to the adult; (2) the adult has assumed the role of a parent on a day-to-day basis for a substantial period of time; (3) the adult possesses information about the child unique from the other participants in the process; (4) the adult has regularly attended juvenile court hearings; and (5) a future proceeding may result in an order permanently foreclosing any future contact with the adult.' [Citations.]" (*Merrick V., supra,* 122 Cal.App.4th at p. 256.)

Here, the maternal grandmother " 'regularly attended juvenile court hearings.' " (*Merrick V., supra,* 122 Cal.App.4th at p. 256.) However, she had assumed the role of a parent on a day-to-day basis for only 20 days, which the trial court reasonably determined was not " 'a substantial period of time.' " (*Ibid.*) The trial court could also reasonably determine that the child, who was only three weeks old at her removal, was not " ' "psychologically bonded" ' " to the maternal grandmother. (*Ibid.*) Additionally, the trial court could reasonably determine that, because the child was placed with other maternal relatives who wanted to support the mother in her efforts to maintain contact with the child, future proceedings would not " 'result in an order permanently foreclosing any future contact with' " the maternal grandmother. (*Ibid.*) Finally, on this record, nothing supported a finding that the maternal grandmother " 'possesse[d] information about the child unique from the other participants in the process.' " (*Ibid.*) Thus, the trial court did not abuse its discretion in denying the grandmother's request for de facto parent status.

### C.     *The Mother's Stay Request*

In her writ petition, the mother indicates she is requesting a temporary stay. The mother states that she is appealing her conviction for driving under the influence with great bodily injury and asserts that "nothing should happen until it is decided." However, the mother has not provided any information concerning an appeal from her criminal

case, and we have not located any pending appeal in this court. Thus, we deny the mother's request for a stay in the instant matter.

## IV. DISPOSITION

The petitions for extraordinary writs and request for stay are denied.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MIHARA, J.

_____

MÁRQUEZ, J.