Filed 2/18/15  In re Fernando V. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re FERNANDO V., a Person Coming Under the Juvenile Court Law. | B256083 |
| | (Los Angeles County Super. Ct. No. CK90187) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| FERNANDO V., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Julie Fox Blackshaw, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel for Plaintiff and Respondent.

Fernando V. Sr. (father) appeals from a judgment of the juvenile court, challenging the court's jurisdictional and dispositional orders regarding his minor son Fernando Jr. (Fernando). He contends that the orders were unsupported by substantial evidence and that the juvenile court failed to recite on the record a factual basis for removing Fernando from father's custody. We find no merit to father's contentions and affirm the judgment.

## BACKGROUND

At the time of Fernando's birth in October 2013, while in the hospital, mother, Mayra M. (mother) tested positive for methamphetamine and amphetamine. Fernando did not test positive for the drugs, but was born prematurely and remained in the hospital until he was detained in December 2013. At that time, the Department of Children and Family Services (DCFS or the Department) filed a petition pursuant to Welfare and Institutions Code section 300 (section 300 petition), to bring Fernando within the jurisdiction of the juvenile court.[1] The juvenile court had previously taken jurisdiction of mother's five other children, Fernando's half brothers, who had been placed in the custody of their maternal grandmother. Fernando was mother's only child with father. Father was 22 years old at the time of Fernando's birth.

The section 300 petition alleged under subdivisions (b) and (j) that mother had a 15-year history of drug abuse and that she was a current user of methamphetamines and amphetamines, having tested positive for those drugs at the time of Fernando's birth, which rendered her incapable of providing regular care for the child. The petition further alleged that mother's five other children all received permanent placement services due to mother's illicit drug use.

At the detention hearing, the juvenile court released Fernando into the custody of father.

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

2

In February 2014, prior to the disposition hearing, the Department recommended that Fernando remain in father's custody. The Department had learned that father had one other child from another relationship, five-year-old daughter Ashley, who lived with her mother. Father claimed that he visited Ashley regularly and contributed to her support. Though the Department had received a referral more than a year earlier in which it was alleged that father had driven with Ashley in his car while he was intoxicated, the report was unfounded and no dependency proceedings resulted.

Father's criminal record included a conviction for auto theft. According to father, the charge was dismissed after he completed probation and paid restitution. Father claimed not to know that mother was using drugs while pregnant, and he denied that he had ever used or experimented with drugs or alcohol. Father submitted to a drug test before Fernando was released to him which was negative. Father was employed full time by the City of Los Angeles and earned $42,000 per year. The Department reported that in mid-January 2014, Fernando was well and appeared to be on track developmentally; however later there were some concerns about father's home after the Department's dependency investigator appeared for a home visit and found the apartment filthy and cluttered, with no food or a crib.

Mother and father submitted to the court's jurisdiction, and both counts of the section 300 petition were sustained on February 14, 2014. Fernando was declared a dependent of the juvenile court with continuing placement in father's home. Father was ordered to enroll in counseling and attend Al-Anon meetings. Mother was allowed monitored visits only with a DCFS approved monitor.

On April 2, 2014, the Department filed a subsequent dependency petition pursuant to section 342, alleging new facts. The petition alleged under section 300, subdivision (b), that father was unwilling and unable to provide appropriate parental care and supervision for Fernando, and on March 28, 2014, father requested that the Department remove the child from his home.

In the detention report, social worker Danielle Murphy (CSW or Murphy) advised that paternal grandmother was providing most of Fernando's care. Though father

3

claimed he left the child with paternal grandmother only while he worked, during one two-week period he did not take Fernando home at night because father was ill with strep throat and infected wisdom teeth for which he was taking pain medication. Paternal grandmother told the CSW that father left the child with her all the time and did not provide her with money or other necessities. The CSW also learned that paternal grandmother had an open dependency case involving her autistic son who had displayed violent and suicidal behavior. At a Team Decision Meeting (TDM) with parents and the CSW, it was determined that paternal grandmother could no longer assist in caring for Fernando. The CSW then met with maternal grandmother who indicated she already had eight other children under her care and could not take care of Fernando. Maternal grandmother also told the CSW that father did not provide needed items when Fernando was in her care. Paternal aunt was not a placement option as she had an open dependency case.

The juvenile court ordered the child detained in shelter care and gave temporary custody to the Department pending disposition or further order of the court. The court granted father unmonitored visits of two hours per day and family reunification services. A contested adjudication hearing was held on April 23 and May 2, 2014. Mother, who was participating in a residential drug treatment program at that time, was not offered reunification services.

Father had told the CSW that he could not care for Fernando due to both a lack of childcare and his lack of the parenting skills required to care for an infant who was "constantly crying." He also said that caring for Fernando "24/7" caused him to have employment issues and left him with no time to resolve the pending suspension of his driver's license. Prior to the adjudication hearing, the CSW reported that she had given father referrals for childcare and transportation assistance. The CSW later learned that between the February adjudication and the time a place opened for mother in a residential program, mother lived with father and was Fernando's primary caregiver while father was at work. As of mid-April father had not enrolled in counseling or Al-Anon, and

4

although he asked that Fernando be placed with his sister, he was unable to provide any information about her since she had discontinued contact with him.

The child's foster caregiver reported that when Fernando was placed with him on March 28, 2014, he arrived with only a bottle and the clothing he wore. It was also reported that father telephoned twice to ask about Fernando, but did not visit or attempt to schedule any visits.[2]

At the adjudication hearing CSW Murphy testified that she had no evidence of any drug abuse by father or of any domestic violence, and that she had visited father's home the previous month without finding any child safety issues. She knew father was sick in February and March and missed three weeks of work due to a foot injury. Just before he returned to work at the end of March, father told CSW Murphy that he did not know what to do. Murphy never saw a crib in father's home.

Murphy also testified that she did not consider paternal grandmother to be a suitable caregiver due to her open dependency case based on the allegation that her autistic son was violent. Murphy also had information that two other adults who lived in paternal grandmother's home had criminal histories, which would require a special waiver before Fernando could be placed in her home. Murphy doubted that paternal grandmother would be forthcoming with the CSW as she did not attend the last TDM, and had reported being fearful of father, who was verbally aggressive toward her. Paternal grandmother also said she could not afford to care for the child and that father had not provided money or diapers in the past. Paternal grandmother felt that father took advantage of her by leaving the baby with her full time. There were two TDMs in this case, one in early February, one in mid-March, and childcare was the primary issue.

Paternal grandmother was called to testify under Evidence Code section 776. She testified that Fernando lived with her seven days a week during February and March 2014. She was upset that father would not take the baby on the weekends and did not

---

[2]    The adjudication/disposition report recounted other conversations with the foster caregiver and with paternal aunt. As the court sustained father's hearsay objections to those conversations, they are not summarized here.

give her money, diapers or other supplies during that time. Father's visits lasted only about 30 minutes. He sometimes fed the baby, but did not change diapers. When the baby cried, father would get frustrated and upset. Paternal grandmother testified that father would become upset with her, and would yell at her. She admitted she knew mother and father were living together in early 2014, despite the court's order that the child live only with father, and she did not disclose this information to any social worker.

Paternal grandmother was willing to care for Fernando during the week, but had not spoken to father about it because father was upset with her. She could be home with Fernando all day as she did not work. She denied that her autistic son had stabbed anyone or had ever tried to harm another child, and claimed that his problems occurred at school and consisted of "ditching classes." Although he had trouble with anger, he would "shut down" when angry. That son was in therapy, and she expected DCFS would close the case because they had found no negligence.

On May 2, 2014, the second day of testimony in the contested adjudication hearing, the Department filed an addendum report with rebuttal evidence regarding paternal grandmother's dependency case. The emergency response social worker (ER CSW), reported that a referral was generated after paternal grandmother's 12-year-old autistic son threatened to stab a counselor with a pencil. The boy did stab a tutor at school with a pencil and punched him while being restrained. Paternal grandmother told the ER CSW that when he became upset at home, he would hit the wall, and once he threatened paternal grandmother with a sharp object, then ran upstairs, put a window-shade cord around his neck, and attempted to jump out the window. The ER CSW indicated that although the DCFS referral would be closed, the boy's behavior was unpredictable and paternal grandmother felt overwhelmed with his mental health issues. She also felt stressed when caring for Fernando full time.

Father testified that he had been employed by City of Los Angeles Housing Authority for two years as a landscaper, and his hours were weekdays, 8:00 a.m. to 5:00 p.m. He made childcare plans with maternal grandmother a few days before giving testimony. Maternal grandmother said she would be willing to take care of Fernando,

although she has six other children. Father had also spoken to paternal grandmother. He planned to have both grandmothers care for Fernando, Monday through Friday, and to give them $200 from each paycheck for diapers, food, and clothes. He would take the child on the weekends. Father admitted that mother lived with him in January 2014, but claimed that the first emergency response worker on the case approved the situation until a place opened in mother's residential program.

Father also testified that in February and March he had strep throat, gingivitis, an infected wisdom tooth and a foot injury, causing him to miss about 30 days of work. For some of that time Fernando was with paternal grandmother. Father was overwhelmed by the task of caring for Fernando while he was sick and not receiving his full pay. Father admitted he had not visited Fernando since his detention. Father planned to move out of his apartment the following week due to an eviction notice -- DCFS had referred him to Bridge for Homes which indicated they would have something for him.

The juvenile court sustained the section 342 petition and declared Fernando a dependent of the court. The court found that father had inappropriately allowed mother to care for Fernando in violation of a court order, had rarely taken care of the child, had essentially handed him off to other people, and due to illness and injuries had not been a major caretaker. The court found that father's childcare plans were inappropriate because paternal grandmother was resentful, they barely got along, father did not support her, and she was not in court to confirm that she was willing to take the child. Further, the court was not assured that paternal grandmother's home was safe, due to the violent tendencies of her autistic child. The court found that maternal grandmother's home was not safe or appropriate with so many other children in her care. The court noted that father's visits were infrequent and during visits his involvement was minimal. The court found no reason to believe that father would not again give the child to a grandparent and fail to be supportive.

The court concluded that the same facts provided clear and convincing evidence pursuant to section 361, subdivision (c), that there was a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned to the

7

parents' custody, with no reasonable means to protect him without removing him from their custody, and that reasonable efforts had been made to eliminate the need for removal from the parents' home. The court placed the custody, care, and control of Fernando under the supervision of the Department, and ordered father to enroll in individual counseling and interactive parenting classes. The court found that mother had shown commitment to her program and good faith in addressing her problems, and ordered reunification services for both parents, with monitored visits for mother and unmonitored short visits for father until he completed parenting classes. Father filed a timely notice of appeal from the judgment.

**DISCUSSION**

## I. Jurisdiction

Father contends that the there was insufficient evidence to support the jurisdictional findings made in sustaining the subsequent petition.

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'" [Citation.]" [Citation.]' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Section 300, subdivision (b), provides in relevant part for jurisdiction when the "there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." The section 342 petition alleged that father was unwilling and unable

8

to provide appropriate parental care and supervision for Fernando and that on March 28, 2014, father requested that the Department remove the child from his home. This allegation was sufficiently supported in the detention report which noted father's consent to Fernando's detention in March, due to father's inability to take care of the child.

Father contends that the Department was required to prove that the allegation was still true at the time of the jurisdictional hearing. He relies on *In re Rocco M*. (1991) 1 Cal.App.4th 814 (*Rocco*), which held at page 824: "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm. [Citations.]" Father argues that the current conditions shown did not establish a substantial risk of serious physical harm. We disagree. At the time of the hearing in this case Fernando was six months old as opposed to the child in *Rocco* who was 11 years old. The court in that case recognized, "the absence of adequate supervision and care [of infants] poses an inherent risk to their physical health and safety." (*Id*. at p. 824.) As the juvenile court found, father's infrequent visits, his minimal involvement during visits, and his lack of support for the grandparent caregivers indicated a risk that father would again give up all childcare duties to a grandparent and fail to be supportive. Thus, Fernando's infancy and father's past failure to provide adequate supervision indicated a risk of substantial harm.

Moreover, there is no merit in father's claim that by the time of the contested hearing all childcare issues had been resolved. He argues that his plan to have paternal grandmother care for Fernando while he worked was appropriate because the dependency case involving her autistic son would be closed. Contrary to father's suggestion that the autistic son no longer posed a risk, paternal grandmother testified that DCFS was going to close the case because her son was in therapy and she had not been found negligent. In fact, paternal grandmother ultimately admitted that her son had trouble with anger. Also the ER CSW who investigated that referral reported that according to paternal grandmother, her autistic son would hit the wall when he became upset at home, had threatened her with a sharp object, and had made an apparent suicide attempt. The ER

CSW also reported that the autistic son had threatened to stab a school counselor with a pencil, that he stabbed and punched a tutor at school, and that although the DCFS referral would be closed, the boy's behavior was unpredictable. Paternal grandmother indicated she was overwhelmed with her son's mental health issues, and that caring for Fernando full time had caused her additional stress. CSW Murphy testified that paternal grandmother feared father, who had been verbally aggressive, and that two residents of paternal grandmother's home had criminal histories. Finally, as the juvenile court observed, paternal grandmother did not come back to court to confirm that she was willing to take Fernando on the conditions offered by father in his testimony, which consisted of father's promise to provide money for diapers and food in the future. Neither paternal grandmother nor the court was required to find that father's promise would be kept, particularly in light of his misrepresentation to the CSW regarding taking Fernando home during the week or on weekends and caring for him "24/7," and his violation of the court order which required mother to have only monitored visits with Fernando.

Father contends that the juvenile court's finding that his childcare plan was inappropriate created a Hobson's choice between his employment and continued custody of his child. Relying on a comparison with *Maggie S. v. Superior Court* (2013) 220 Cal.App.4th 662, and *In re S. D.* (2002) 99 Cal.App.4th 1068, father contends that his circumstances are comparable to those of an incarcerated parent who arranges for childcare while in custody. The comparison fails, however, because in those cases, there was no history of inadequate supervision or neglect, and the sole basis for dependency jurisdiction was the incarceration of the mother. (See *Maggie S.*, at pp. 664, 672; *S. D.*, at pp. 1070-1071, 1077.) Here, after dependency jurisdiction had already been established due to mother's substance abuse, father, who worked 40 hours a week, left his infant son with an overwhelmed grandmother seven days a week without provision of money, food, diapers, or other supplies. Substantial evidence supported the court's jurisdictional findings.

10

## II.  Dispositional order

Father contends that the juvenile court's order removing Fernando from father's custody was unsupported by substantial evidence.  In particular, father makes three contentions:  that insufficient evidence supported a finding that the Department made reasonable efforts between February 14, 2014 and March 28, 2014, to eliminate the need to remove Fernando from his custody; that the juvenile court failed to state on the record the facts on which the court's decision was made; and that insufficient evidence supported the removal of Fernando from father's custody.  None of father's three contentions has merit.

### A.  *Reasonable efforts*

Before removing Fernando from father's custody, the juvenile court was required to find by clear and convincing evidence that the child would be at substantial risk of harm if returned home and there were no reasonable means by which he could be protected without removal.  (§ 361, subd. (c)(1).)  The court was then required to determine whether reasonable efforts were made to prevent or to eliminate the need for removal and to state the facts on which the court's decision was made.  (§ 361, subd. (d).)

As we did with the court's jurisdictional findings, we review the court's dispositional order for substantial evidence, contradicted or uncontradicted; "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.  [Citation.]"  (*In re Heather A*. (1996) 52 Cal.App.4th 183, 193.)

"A social services agency is required to make a good faith effort to address the parent's problems through services, to maintain reasonable contact with the parent during the course of the plan, and to make reasonable efforts to assist the parent in areas where compliance proves difficult.  [Citation.]  However, in most cases more services might have been provided and the services provided are often imperfect.  [Citation.]  'The standard is not whether the services provided were the best that might be provided in an

11

ideal world, but whether the services were reasonable under the circumstances.' [Citation.]" (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598-599.)

The Department was required to include in its social study a "discussion of the reasonable efforts made to prevent or eliminate removal." (Cal. Rules of Court, rule 5.690(a)(1)(B)(i); see *In re Ashly F*. (2014) 225 Cal.App.4th 803, 809.) The Department complied with that rule here, and its reports demonstrate substantial evidence that the services were reasonable under the circumstances. The action reported by the Department in the jurisdiction/disposition of April 23, 2014, included referrals for housing, childcare, and transportation assistance, as well as the "Reunification Program" which father failed to attend. The report also referred to the efforts discussed in the detention report dated April 2, 2014: "CSW Murphy encouraged the father to find a licensed childcare provider so [she] could put in a referral for childcare. CSW Murphy provided information on Family Preservation so the father could receive parent training. There were two separate Team Decision Meetings held to explore options with the family. [¶] The Department assessed relatives as potential babysitters for the child."

Father suggests that in addition to the services provided, the Department should have made regular unannounced visits to paternal grandmother, and should have provided father with in-home parenting services and childcare referrals. The detention report contained the following: "The father did not find a licensed childcare provider so a referral was not put in for childcare. The father refused to sign the consent for Family Preservation so CSW Murphy was unable to submit a referral for Family Preservation. There were no viable options for family members to babysit the child due to concerns regarding [them]."

Apparently it is father's argument that, when faced with father's refusal to obtain parenting services through Family Preservation and his failure to look for licensed childcare, the Department should have sent someone to his home to teach him to parent and should have made the calls necessary to find a licensed childcare provider. That contention is rejected. "[T]here is no 'requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions'" or other

services.  (*In re Nolan W*. (2009) 45 Cal.4th 1217, 1233.)  We also reject any suggestion in father's argument that his refusal or failure to avail himself of the Department's services renders its efforts unreasonable.

### B.  Factual basis

Father contends that the juvenile court failed to state the facts on which it based its removal decision as required by section 361, subdivision (d).  He contends that the court mentioned only the safety of paternal grandmother's home, and he argues that that factual basis was speculative, as demonstrated by the court's comment that any "risk assessment might be too speculative at this point."  We do not construe the comment as speculation. The court's meaning is unclear, but could just as well be a refusal to speculate that paternal grandmother's home was safe.

In any event as respondent points out, the court did, in fact, recite detailed facts supporting jurisdiction, and expressly stated that the same facts supported removal, thus incorporating the recital into the dispositional order.  As we paraphrased the court's factual basis in detail in our Background section, *ante*, we need not repeat it here. Father's contention that the court's recital was limited to its jurisdictional findings is mistaken and we conclude that the court complied with its obligation under section 361, subdivision (d).

### C.  Substantial evidence to support removal

Father contends that the removal order was unsupported by substantial evidence. He suggests that the court's comment about speculative risk assessment demonstrates that the court merely speculated that paternal grandmother's home was unsafe.  Again we disagree with father's interpretation of the comment, and observe that father makes no effort to summarize all the evidence supporting the juvenile court's findings and conclusions in support of removal.  Father's omission is apparently due to the failure to notice that the court expressly referred to the evidence supporting jurisdiction and stated that it also supported removal.

It is father's burden on appeal to demonstrate that the juvenile court's findings are not supported by substantial evidence.  (*In re Diamond H*. (2000) 82 Cal.App.4th 1127,

1135 (*Diamond H.*), overruled on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) He has not met that burden. Father cites the statement in *In re James T*. (1987) 190 Cal.App.3d 58, 65, that section 361 permits removal from a parent's custody only in extreme cases of parental abuse or neglect. Then, without summarizing the evidence supporting the order in the light most favorable to the court's order, or explaining how much neglect he would consider sufficiently extreme to support removal, he concludes that this is not such a case. Indeed, father fails to summarize any of the evidence presented to support removal, but merely repeats his claim that the Department's efforts to avoid removal were unreasonable because they did not include weekly unannounced home visits, in-home parenting services, and locating child care. We have already rejected that contention.

"A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citations.]" (*Diamond H., supra*, 82 Cal.App.4th at p. 1136.) Here, when Fernando was an infant, father allowed mother to live in his home and care for the child in violation of a court order and despite knowing that mother was a controlled substance abuser. Then, for the ensuing nearly two months, father left Fernando all the time with one grandmother or the other, not just during his illness. Father did not even have a crib for Fernando in his own home. Furthermore, father failed to provide the caretakers with money or other necessities for Fernando, and told the CSW that he took Fernando home with him for weekends when he had not. When father was informed that the grandmothers were not appropriate caretakers, he did not look for licensed childcare, and although he admitted to the CSW that he lacked some of the parenting skills required to care for an infant who was "constantly crying," he failed to avail himself of family preservation services or to enroll in court-ordered counseling and Al-Anon. Finally, father voluntarily gave custody of Fernando to the Department and during the month Fernando was in foster care prior to the

14

jurisdiction/disposition hearing, father did not visit him.  We conclude that such evidence sufficiently supports the removal order.

## DISPOSITION

The judgment of the juvenile court is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
HOFFSTADT