Filed 7/7/15  Ruby W. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RUBY W.,<br><br>                Petitioner,<br><br>     v.<br><br>THE SUPERIOR COURT OF STANISLAUS COUNTY,<br><br>                Respondent;<br><br>STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>                Real Party in Interest. | F071270<br><br>(Super. Ct. Nos. 516765, 516766)<br><br><br>**OPINION** |

## THE COURT[*]

ORIGINAL PROCEEDING; petition for extraordinary writ review.  Ann Q. Ameral, Judge.

Robert D. Chase for Petitioner.

No appearance for Respondent.

John P. Doering, County Counsel, and Maria Elena Ratliff, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]    Before Levy, Acting P.J., Gomes, J. and Peña, J.

Ruby W. seeks extraordinary writ relief from the juvenile court's orders issued at a contested 18-month review hearing (Welf. & Inst. Code, § 366.22, subd. (a))[1] terminating her reunification services and setting a Welfare and Institutions Code section 366.26 hearing as to her adopted sons, seven-year-old G.W. and four-year-old X.W. She contends the Stanislaus County Community Services Agency did not provide her reasonable reunification services. She further contends her trial attorney was ineffective for failing to challenge the reasonableness of services at the 12-month review hearing or by direct appeal. We deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

Ruby is the biological great-grandmother of G.W. and X.W. She adopted them in 2012, because their biological mother, Laura, was drug-addicted and in and out of jail.

On August 22, 2013, Officer England of the Ceres Police Department responded to a report that a woman, approximately 70 years old, was in Walmart with a small child who appeared to have been physically abused. Officer England located Ruby in the store pushing then two-year-old X.W. in a shopping cart. X.W. had significant injuries on his face and head, including numerous bruises, two black eyes, a split lip, a large welt on his forehead and other marks on the top of his head and forehead.

Ruby told Officer England her grandson, Michael, and his girlfriend, Tara, had been staying at her house for approximately one month. Laura had been staying there for two or three days. Michael and Laura have criminal histories that involve charges and convictions for drug possession and violent offenses.

Ruby said that on the day before, X.W. and G.W. were outside in the backyard playing. Michael and Tara were also in the backyard. Ruby went outside to check on X.W. and he started to run toward her. He slipped in the soft dirt and fell into the side of

___

**1**    All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2.

the house and onto the ground. Ruby later changed her story and said that X.W. entered the residence with Michael and Tara. X.W. had visible swelling on the right side of his forehead. Michael and Tara told Ruby that X.W. slipped in the sand, causing him to fall into the side of the house and then to the ground. Ruby said she did not see X.W. fall.

Officer England asked Ruby why her story changed. Ruby became argumentative but then broke down and said she believed Michael injured X.W. The week before, Michael was giving X.W. a bath and she heard X.W. crying. She checked on him several times but could not figure out why he was crying. Ruby said X.W. did not have any other visible injuries besides the injury on his forehead and had not had any visible injuries prior to this incident. However, she later changed her story and said he had small bruises on his body from falling on the bricks in front of the house on August 20, 2013. She said she never physically abused X.W. She spanked him on the buttocks but never hard.

Officer England called for an ambulance and X.W. was transported to the hospital. Officer England also contacted the Stanislaus County Community Services Agency (agency), and social worker Michelle Silveira joined Officer England, Detective Britton Moore, Ruby and X.W. in the emergency room.

X.W. told Silveira, "him hit me, Bo hit me, and Momma hit me." "Him" was a reference to Michael and "Bo" a reference to G.W. When asked who "Momma" was, X.W. pointed to Ruby. G.W. said Michael hit him and X.W. but that Ruby did not.

Silveira took X.W. and then-five-year-old G.W. into protective custody. Detective Moore took Ruby to the police department and interviewed her.

Ruby told Detective Moore that approximately one week before, X.W. sustained a small bruise on his head and a cut lip while outside with Michael. Michael told her X.W. fell. X.W. said Michael hit him and threw X.W. against the wall of the house. After that, Ruby said she tried not to leave the children alone with Michael. However, the morning before, Michael was outside with the boys making them clean up the yard when X.W.

3.

went into the house and had the large wound on his forehead. Michael said X.W. ran away from him and fell. Ruby believed that Michael either pushed X.W. or hit him. She said X.W. was afraid of Michael and cried if Michael was around.

Ruby also told Detective Moore about an incident when Michael was bathing X.W. and screaming at him and X.W. vomited in the bathtub. She also heard Michael hit X.W. with what she thought was a belt. She went in to investigate and Michael told her it was a wet towel. She took X.W. out of the bathtub and noticed a red mark on his buttocks. She also disclosed that X.W. had a bruise on his penis. She did not know if Michael or G.W. caused it. She said X.W.'s penis was still swollen but there was no blood in his urine.

Detective Moore told Silveira about the possible injuries on X.W.'s buttocks and penis. She had already taken X.W. back to the hospital. He had major bruising on the left side of his buttocks and red swelling possibly caused by a belt on the right side of his buttocks. He also had other marks in various stages of healing on his buttocks and lower back.

Michael was arrested and Detective Moore interviewed him at the jail. Michael stated he was staying with Ruby to help with his terminally ill adult brother. He did not have to discipline the children, but stepped in when Ruby seemed stressed. He said he used "time out" with them. He said that G.W. was mean and bit, hit and kicked X.W. G.W. also screamed, yelled and caused Ruby stress.

Michael told Detective Moore that Ruby and Laura hit X.W. He claimed that Laura had prior charges for assault with a deadly weapon and had been in jail for murder and other violent offenses. He admitted spanking the children, but denied hitting them with a belt or a towel. He believed Laura hit X.W. with a belt. He said there was never an incident when he hit the children during a bath and said X.W. vomited once because he was sick. He said X.W. fell outside and sustained the bump on his head, black eyes and split lip. He put ice on X.W.'s head as a form of treatment. He explained that X.W.

4.

was afraid of him because Ruby told X.W. that Michael would "get" him if he misbehaved.

Detective Moore forwarded his reports to the district attorney for possible charges against Michael for child abuse and Ruby for child endangerment.

The department filed a dependency petition on behalf of G.W. and X.W. alleging they were described by subdivisions (a) (serious physical harm) and (b) (failure to protect) of section 300.

In November 2013, the juvenile court adjudged the children dependents as alleged, ordered them removed from Ruby's custody, and ordered her to participate in mental health counseling and parenting classes. The department placed the children in foster care.

In March 2014, Ruby was arrested on two counts of felony child abuse.

In April 2014, the agency filed its report for the six-month review hearing and recommended the juvenile court continue Ruby's reunification services. The agency reported that Ruby had made steady progress in her services plan and regularly visited the children. She completed a 10-week parenting class and individual counseling. Her clinician requested an additional 10 sessions of individual parenting education to help her more fully benefit from the parent/child labs. The agency also reported that Ruby had obtained restraining orders against Laura and Michael.

In June 2014, the juvenile court conducted the six-month review hearing and approved an updated plan, which required Ruby and the children to participate in parent/child interactive therapy (PCIT) labs. It also required Ruby to address enabling and co-dependency in her counseling sessions and demonstrate that she could protect the children from physical and sexual abuse. The court continued Ruby's reunification services to the 12-month review hearing scheduled in October 2014.

By October 2014, Ruby was reportedly doing well in her counseling sessions and demonstrated that she would comply with the restraining order against Laura. She had

5.

also developed a safety plan to protect the children and was working on assertiveness and boundary-setting. However, the agency was not convinced that Ruby would protect the children. One incident in particular concerned the agency. In June 2014, Ruby told a social worker that G.W.'s foster mother made him eat a hot pepper as punishment. Ruby recognized that it was a form of child abuse but said she was willing to overlook it to prevent the children from being moved again. She also stated she did not know the children were being abused until the agency intervened.

The agency further reported that G.W. and X.W.'s behavior was challenging. G.W. was aggressive and threw temper tantrums. X.W. was hyper and did not listen or follow directions. They were both seeing a therapist and G.W. was taking medication. The agency referred Ruby for PCIT in June 2014, but the assessor did not believe she spent sufficient time with the children for the therapy to be effective. The agency increased Ruby's visitation with the children to twice a week and resubmitted the referral.

The agency recommended the juvenile court continue Ruby's reunification services so she could participate in PCIT and demonstrate her ability to protect the children.

In November 2014, the juvenile court conducted the 12-month review hearing, found the agency provided Ruby reasonable services, and continued services to the 18-month review hearing, which it set for February 2015. The court also ordered the agency to provide Ruby two visits each week with discretion to advance to overnight visits.

In January 2015, the children's foster parent asked the agency to find them another home because of G.W.'s defiant and destructive behavior. He stabbed X.W. in the cheek with a pencil and was sent to his room. He destroyed the room, breaking frames, pulling curtains down and hitting and kicking the walls. The agency placed the children in a long term foster care home.

In its report for the 18-month review hearing, the agency reported that Ruby completed her individual counseling treatment goals and continued to see her counselor.

She began PCIT in December 2014, and met with G.W. one-on-one for an hour and X.W. one-on-one for the second hour. In January 2015, her PCIT counselor said she was doing "fairly well" given the limited time she had with the children but was using physical force to get them to obey her. X.W. was not responsive to her and rejected her affection. In addition, Ruby was unable to manage the children during visits. They threw furniture and other miscellaneous items out of the visitation room. They also ran out of the room and Ruby could not run after them. On two occasions, they had to be carried out of the building to the foster parent's car.

The agency recommended that the juvenile court terminate Ruby's reunification services because she was in denial about her role in the children's abuse and she could not manage and safely parent them. As late as January 2015, Ruby said she did not know G.W. and X.W. were being physically abused. Had she known Michael was abusing them, she said she would not have taken X.W. to Walmart. She never said she would have called the authorities or sought medical treatment for him.

On February 13, 2015, the juvenile court convened the 18-month review hearing and set it for a contested hearing in March 2015. The court also reduced Ruby's visitation with the children to one time a week until the March hearing.

Ruby testified at the contested 18-month review hearing in March 2015 that she was working with G.W. and X.W. on their aggressive behavior in the PCIT sessions. She perceived G.W. as having made a lot of progress. She believed she could safely parent the children and manage their behaviors because of the skills she learned through PCIT. Ruby conceded, however, that as late as January 2015, she claimed not to know the children were being abused and had to be pushed to admit that she had difficulty parenting them "at times."

Social Worker Rosa Gandarilla was called to testify by Ruby's attorney. She was assigned the case in June or July of 2014. Ruby's attorney asked why the agency delayed in referring Ruby for PCIT, failed to notify Ruby of the children's medical appointments

7.

and allowed a gap in the children's therapy from September 2014 to February 2015. Gandarilla said the children were moved in January 2015 and again more recently. The foster parents were trying to make medical appointments as quickly as they could and had not notified Gandarilla, who in turn did not notify Ruby. Gandarilla explained that the children's changes in placements also resulted in changes in counselors and thus a gap in treatment. Gandarilla testified that she referred Ruby for PCIT in November 2014. When Ruby's attorney asked her why, county counsel objected, arguing the timing was irrelevant because the juvenile court found Ruby was provided reasonable services up to the 12-month review hearing in November 2014. The juvenile court sustained the objection.

At the conclusion of the hearing, the juvenile court terminated Ruby's reunification services and set a section 366.26 hearing. This petition ensued.

## DISCUSSION

Ruby contends a confluence of factors, for which she faults the agency, prevented her from reunifying with the children. Specifically, she argues the agency's delay in referring her for PCIT, its failure to ensure continuity of counseling for the children, and its failure to notify her of the children's medical appointments deprived her and the children the skills and the resources to manage the children's behavior and reunite them as a family. Thus, she contends, the agency did not provide her reasonable services and the juvenile court erred in finding that it did.

Ruby further contends her trial counsel was ineffective for not raising the agency's delay in providing her PCIT as a reasonableness of services issue at the 12-month review hearing or on appeal. We find no merit to her contentions.

At each review hearing, the juvenile court must determine whether the parent was provided reasonable reunification services since the last review hearing. In this case, for example, the juvenile court had to determine whether Ruby received reasonable reunification services since the 12-month review hearing in November 2014.

8.

The crux of Ruby's argument with respect to PCIT is that the agency delayed in referring her for the therapy and as a result of the delay she and the children did not have an adequate opportunity to fully benefit from it. There are two problems, however, with her argument at this stage of the proceedings: (1) the delay to which she refers occurred prior to the 12-month review hearing, and (2) she did not appeal the juvenile court's reasonable services finding. The record reflects that the agency addressed the delay in its 12-month status report, explaining that Ruby was referred for PCIT in June 2014, but that she was not considered a candidate for the program because of the infrequency of her visitation. As a result, the agency increased her visits and submitted a second referral in early October 2014. At the 12-month review hearing in November 2014, Ruby was approved for the therapy but had yet to begin. Her attorney did not argue the delay was unreasonable at the hearing or challenge the court's finding on appeal. Consequently, it is now final and binding and not subject to our review. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018.)

Ruby contends nevertheless that her trial counsel was ineffective for not raising the reasonable services issue on appeal from the juvenile court's orders issued at the 12-month review hearing. She does not, however, explain why this court should review a claim of ineffective assistance of counsel arising from an antecedent final order. (See *In re S.D*. (2002) 99 Cal.App.4th 1068, 1079-1082.) Further, even assuming for the sake of argument that the circumstances permitted our review, we would nevertheless conclude that Ruby's trial counsel was not ineffective as we now explain.

A petitioner asserting ineffectiveness of counsel must prove trial counsel's performance was deficient, resulting in prejudicial error. (*In re Kristin H*. (1996) 46 Cal.App.4th 1635, 1667-1668.) We need not evaluate counsel's performance if petitioner fails to prove prejudicial error; i.e., absent counsel's errors, there is a reasonable probability of a more favorable outcome. (*In re Nada R*. (2001) 89 Cal.App.4th 1166, 1180.) Therefore, to prevail on a claim that her attorney was ineffective, Ruby would

9.

have to show that the juvenile court or this court would have found the agency's efforts in providing her PCIT were unreasonable if her attorney had raised the issue in a timely manner. However, this record would not support such a conclusion. The agency provided a reasonable explanation for the delay in facilitating Ruby's access to PCIT. Further, even if the agency's efforts were deemed unreasonable, the juvenile court would have continued Ruby's reunification services, which it did. Thus, Ruby was not prejudiced by her attorney's failure to challenge the juvenile court's reasonable services finding.

As to the agency's efforts to provide her services from the 12-month review hearing to the 18-month review hearing, Ruby contends they were unreasonable because the agency did not ensure that the children were in therapy at all times and did not notify her of the children's medical appointments. Ruby fails, however, to show specifically how the agency's efforts in those areas were unreasonable, especially given evidence that the circumstances were beyond the agency's control. Notably, Gandarilla explained that the children's therapy was disrupted by the need to change their placement multiple times and that the foster parents did not always notify her of the children's medical appointments.

We conclude substantial evidence supports the juvenile court's finding that Ruby was provided reasonable services and affirm its orders terminating her reunification services and setting a section 366.26 hearing.

## DISPOSITION

The petition for extraordinary writ is denied. This opinion is final forthwith as to this court.