121 Cal.Rptr.2d 518 (2002)
99 Cal.App.4th 1068
In re S.D., a Person Coming Under the Juvenile Court Law.
Orange County Social Services Agency, Plaintiff and Respondent,
v.
Stephanie D. et al., Defendants and Appellants.
No. G029893.
Court of Appeal, Fourth District, Division Three.
June 27, 2002.
Review Denied September 11, 2002.
*519 Jennifer Mack, under appointment by the Court of Appeal, and Richard Pfeiffer, for Defendant and Appellant Stephanie D.
Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant John D.
Benjamin P. de Mayo, County Counsel, and Ward Brady, Deputy County Counsel, for Plaintiff and Respondent.
Kathleen Murphy Mallinger, under appointment by the Court of Appeal, for the Minor.

OPINION
BEDSWORTH, Acting Presiding Judge.
This is an unusual dependency case, and perhaps that is why it has run a full course, resulting in an order terminating parental rights, without anybody recognizing that it never should have been one. Stephanie D. and John D., the parents of S.[1], are apparently small time crooks; however, there is no suggestion they were bad parents. There is no evidence they *520 abused or neglected S., nor that they had any debilitating mental impairment or substance abuse problems. The sole reason that S. came into the dependency system was that neither Stephanie nor John was available to care for him when Stephanie was arrested and incarcerated for credit card fraud.[2] On that sole basis, the court sustained a dependency petition erroneously, as it turned out, because there was neither any allegation nor any evidence that Stephanie was unable to arrange for care of S. during her incarceration. Such inability is the key fact that allows the court to take jurisdiction over the child of an incarcerated parent when there are no other grounds for doing so. And here there were none.
Although the jurisdictional order was itself appealable, and Stephanie failed to file such an appeal, she contends the issue may be raised for the first time here, because her prior failure to do so was the direct result of ineffective assistance of counsel. We agree. The record in this case demonstrates that Stephanie had not one, but two sisters willing to assume care of S. during her incarceration. One of those sisters came from Missouri to assume immediate custody of S. after the detention hearing, and later took long-term custody. The Orange County Social Services Agency (SSA) is now touting her as a prospective adoptive parent. Moreover, by the time of the jurisdictional hearing, John had contacted SSA and requested S. be placed with his mother. Thus, the record in this case strongly suggests that Stephanie had several options for care of S. during her incarceration, and "there simply could be no satisfactory explanation" for her attorney's failure to focus on that fact as a means of defeating the dependency petition. (People v. Pope (1979) 23 Cal.3d 412, 426, 152 Cal.Rptr. 732, 590 P.2d 859.)
Our resolution of Stephanie's appeal obviates the need to consider the issues raised in John's appeal. The judgment is reversed and the case is remanded to the juvenile court with directions to give SSA an opportunity to cure the deficiencies in the jurisdictional allegations and prove that neither Stephanie nor John can arrange for care of S. during any remaining period of time in which they are both incarcerated.
* * *
S. was two years old when he was detained by SSA on November 29, 1999. At the time of his detention, S. was reported to be "healthy and happy" and to "communicate[ ] well and [be] very verbal." Stephanie and John, who had been staying at a Residence Inn for approximately two weeks, had left S. there with Michelle N., the 30-year-old step-daughter of Stephanie's sister, while they went to South Coast Plaza for dinner and shopping. At that time, Stephanie had been in California for about a month, and John perhaps a little less. According to Stephanie, she and John had been separated for some time while living in Missouri, and after she and S. had relocated to California to live with her sister, John had followed her. They had gone out to dinner to discuss their relationship.
As it turned out, the credit card number used to rent the room at the Residence Inn did not belong to John or Stephanie. The innkeeper, who had checked the validity of the credit card number when John and Stephanie checked in (they had only the number, and not the actual card), became suspicious after John and Stephanie began charging an unusual amount of food and other items to their room account. They even requested that hotel staff purchase *521 groceries for them from the store and place the grocery bill on their room account. As a result of the innkeeper's more thorough check, it became clear that John and Stephanie had stolen the credit card number and were using it without authorization. The innkeeper contacted the police.
When the police arrived, they found only Michelle and S. in the room. A records check revealed that Michelle had an outstanding warrant for her arrest, and she was taken into custody. S. was also taken into custody, although Stephanie's sister Cheryl V., arrived at the hotel while police were still there, saying that Stephanie had requested she take S. home with her. The police believed that Cheryl had stolen property in the trunk of her car, and took her to the police department as well. However, she was later released.
Stephanie was arrested the next day, having checked into a different hotel with the stolen credit card number. She was taken to the Orange County jail. John's whereabouts were unknown.
Stephanie's sister Cheryl spoke with the social worker the day after S. was detained. She stated her desire to have S. placed with her, and lamented her inability to pick up S. earlier so "none of this would've happened." Cheryl stated she had resided in California since 1974, and was currently residing in the Costa Mesa Motor Inn. She had had no contact with Stephanie for the 17 years prior to Stephanie's arrival in California. Cheryl admitted to a criminal record of a "petty theft with priors" but had been released from parole in March of 1999.
On December 1, 1999, SSA filed a juvenile dependency petition alleging that S. came within the jurisdiction of the juvenile court for two reasons, "failure to protect" (Welfare and Institutions Code section 300, subdivision (b)) and "no provision for support" (Welfare and Institutions Code section 300, subdivision (g).)[3] On December 2 and 3, the court appointed counsel for Stephanie and for S., and held a detention hearing. Stephanie's sister, Shalonda D., traveled from Missouri to testify at the hearing and request that S. be released to her custody. At the conclusion of the hearing, the court ordered S. detained pending the jurisdictional hearing, and authorized SSA to release him to "any responsible adult relative or suitable adult as deemed appropriate."
SSA released S. to Shalonda on December 3, after the detention hearing. Stephanie and S. had lived with Shalonda for some period of time before they came to California, and many of S.'s things were still at her home. Shalonda was allowed to take S. to Missouri with her, but was ordered to have him back on January 3, 2000, for the jurisdictional hearing. Shortly after S. was released to Shalonda, SSA began arrangements for long term placement of S. with Shalonda.
When interviewed by the social worker, Stephanie admitted she had no one to blame but herself for her own situation, although she also made clear she had no idea that Michelle was on parole and had a warrant out for her arrest when she left S. in Michelle's care. Stephanie had a prior criminal history which included arrests for forgery, counterfeiting and writing a bad check. Her only conviction, however, was for involuntary manslaughter in 1989, which she described as occurring in the context of an abusive relationship. She spent six months in jail and completed three years probation. She stated that she wanted S. to live with Shalonda during her incarceration. When the social worker *522 pointed out that visitation would be unlikely if she were in jail in California and S. was living in Missouri, Stephanie said she would be willing to sacrifice visitation if it meant that S. could remain in the care of family rather than being placed in a foster home.
Shalonda remained in regular contact with SSA during S.'s initial visit with her. However, she and S. unfortunately missed their flight to California for the jurisdictional hearing and had to take a later one. She had her sister, Cheryl, contact SSA to report the problem and assure them that S. "will be here this evening." In light of that delay, the court continued the jurisdictional hearing and took the issue of John's default under submission. Shalonda did not actually present S. in court until the afternoon of the following day. In response to that lapse, the court ordered S. placed in a foster home in California.
Prior to the jurisdictional hearing, SSA had made extensive efforts to contact John in both California and Missouri. On January 3, 2000, John contacted the SSA absent parents search unit and left a message stating he had received their letter. The next day, John spoke with the social worker. He was described as "argumentative," but stated he wanted S. placed in the home of his own mother, Lillian D. John gave the social worker a number where he could be reached, but when she tried to contact him at that number on January 18, 2000, it had been disconnected.
The jurisdictional hearing was held on January 19, 2000. Stephanie was present in custody and was represented by counsel. John did not appear and his default was entered.
The social worker testified at the jurisdictional hearing. She was asked the basis of her opinion that S. was at substantial risk of physical harm or illness due to the conduct of Stephanie and John. She replied that Stephanie had a history of criminal activity, and that she still had charges pending against her in Missouri for which she would be extradited. The social worker also mentioned that Stephanie had left S. in the custody of relatives who also had criminal histories. When asked to explain how Stephanie's criminal activity put S. at risk of illness, she stated that it put him at risk of suffering the consequence of his mother being arrested, i.e., being separated from her, and that while that was not a physical illness, it did have consequences adverse to his well-being.
The social worker also mentioned that just that morning she had received information suggesting that S. was not current on all his immunizations, although she acknowledged on cross-examination that he was not suffering from any illness as a result. The social worker also acknowledged on cross-examination that she had no support for the allegations that Stephanie and John had "abandoned" S. when they left him with Michelle for the afternoon, or that they were remiss in not providing Michelle with medical consent forms and a "means of support" during the anticipated brief term of their outing. She agreed that those allegations could be stricken.
In argument, Stephanie's counsel challenged only count 1 of the petition, based upon section 300, subdivision (b) (failure to protect.) However, he actually conceded that the section 300, subdivision (g) count (failure to provide), was applicable in this case: "I think that the language of that statute is clear and provides for precisely this type of problem, when a parent is incarcerated and unable to care for the child. That statute is on point." (Italics added.)
The court dismissed count 1 of the petition, based upon section 300, subdivision *523 (b) (failure to protect). Thus, count 2 of the petition, based upon section 300, subdivision (g) (failure to provide) was the only remaining basis for jurisdiction. As amended, it alleged the following, "The child resided with mother and father at the Residence Inn in Costa Mesa for approximately one month prior to November 29, 1999. Prior to this date, the family resided in St. Louis, Missouri. [¶] On November 29, 1999, the child was left alone in a motel with a babysitter who had a warrant out for her arrest, and was taken into custody by Officer Balsis of the Costa Mesa Police Department. [¶] On November 29, 1999, at the time the babysitter was arrested, the child's parents were shopping at South Coast Plaza with a stolen credit card. [¶] On November 30, 1999, the mother was arrested for using stolen credit cards and booked at County Jail, (booking number 1912382).[¶] The father's whereabouts are unknown."
The trial found "the allegations of the petition, as amended, ... true by a preponderance of the evidence." At that point in the hearing, counsel for S. asked the court to take evidence establishing John was S.'s presumed father, to facilitate S.'s placement with John's mother, who had also expressed a desire to take him. The court did so, and declared John to be the presumed father. The court, however, refused to release S. to any relatives at that time. Instead, it ordered SSA to investigate John's mother as a potential placement. S. was continued in foster care.
Stephanie was given a reunification plan during her incarceration, which included regular telephone contact with S. She served a brief sentence in Orange County, and was then extradited to Missouri to face charges pending there. At the six-month hearing in August of 2000, SSA reported that Stephanie had performed satisfactorily and recommended that her services be continued for an additional six-month period. It was anticipated she would be paroled from her Missouri incarceration in September of 2000. SSA's report noted that "[t]he undersigned believes the child's mother has the potential to provide a safe and appropriate home for the child if she is, as she states, to be released on September 8, 2000, after her parole hearing. However, if the child's mother is not released in the near future, the undersigned believes the child should be placed with relatives in Missouri." SSA also informed the court that Shalonda was again being considered as a placement for S.
The court ordered the additional period of reunification for Stephanie, but she was not released on parole as anticipated. S. remained in foster care until the twelve-month hearing.
The twelve-month hearing was held in January of 2001. At that time, SSA recommended termination of parental rights. While it acknowledged that Stephanie had completed her case plan, her release date was June of 2002 with only a possibility of parole in June of 2001. Consequently SSA believed there was no substantial probability of reunification within the next six-months. SSA was considering placement with several relatives at that time. John had not yet resurfaced.
The court terminated reunification services and set the matter for a section 366.26 hearing. It ordered that a writ advisement be sent to both parents, and that a search declaration be prepared regarding John's whereabouts, if appropriate. The writ advisement for John was returned to the court marked "attempted address not known."
SSA filed a section 366.26 report in June of 2001. By that time, S. had been placed with Shalonda, and SSA was discussing *524 adoption and guardianship with her. Shalonda was unsure she wanted to adopt S., because she had been told that Missouri adoption law would require her to deny any contact between Stephanie and S. until S. turned 21. Shalonda did not wish to be put in that position as she felt it would be in S.'s best interests to continue contact with Stephanie. Ultimately, Shalonda said she would be willing to adopt despite her reservations, and SSA recommended her as a prospective adoptive placement.
John resurfaced in June of 2001, and requested counsel. Counsel was appointed and entered a general denial on his behalf. Counsel subsequently filed a petition pursuant to section 388, arguing that John had not been given proper notice of the hearing. It also alleged that John now had a job and a home in Missouri, and was ready, willing and able to take custody. The court granted a hearing on the petition, but ultimately denied it.
At the section 366.26 hearing, the court found that S. was likely to be adopted and that none of the statutory exceptions to adoption applied. It consequently had no choice but to select adoption as the permanent plan and to terminate parental rights.
Welfare and Institutions Code section 300 provides in pertinent part that "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependant child of the court: [¶] ... [¶] (g) The child has been left without any provision for support; physical custody of the child has been voluntarily surrendered pursuant to Section 1255.7 of the Health and Safety Code and the child has not been reclaimed within the 14-day period specified in subdivision (e) of that section; the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child; or a relative or other adult custodian which whom the child resides or has been left is unwilling or unable to provide care or support for the child, the whereabouts of the parent are unknown, and reasonable efforts to locate the parent have been unsuccessful." (Italics added.)[4]

I
Stephanie contends that there was no basis for the juvenile court to take jurisdiction in this case, because SSA had pleaded and proved only that she had been incarcerated, but not that she was unable to arrange for care of S. She further argues that her counsel rendered ineffective assistance in failing to recognize and assert that defect at the time. We agree on both counts.
Although a claim of ineffective assistance of counsel is usually raised by way of a writ of habeas corpus, it may be effectively raised as part of an appeal in the rare case where the appellate record demonstrates "there simply could be no satisfactory explanation" for trial counsel's action or inaction. (People v. Pope, supra, 23 Cal.3d 412, 426, 152 Cal.Rptr. 732, 590 P.2d 859.) As this court has previously explained, such a claim, made as part of the appeal, may be asserted even after the order terminating parental rights at the section 366.26 hearing. (In re Eileen A. (2000) 84 Cal.App.4th 1248, 1256, 101 Cal. Rptr.2d 548.)
In this case, counsel's error is patent. At the jurisdictional hearing, he actually conceded that section 300, subdivision (g) was applicable to this case, based upon a *525 clear misstatement of what that subdivision requires. Counsel stated: "I think that the language of that statute is clear and provides for precisely this type of problem, when a parent is incarcerated and unable to care for the child. That statute is on point." (Italics added.) But that is not at all what the statute says. The cited provision requires that the incarcerated parent be unable to arrange for the child's care. That is a huge distinction.
There is no "Go to jail, lose your child" rule in California. (See, In re Brittany S. (1993) 17 Cal.App.4th 1399, 1407, 22 Cal. Rptr.2d 50 ["this appears to be a case where an incarcerated parent was destined to lose her child no matter what she did. We cannot condone such a result"].) If Stephanie could arrange for care of S. during the period of her incarceration, the juvenile court had no basis to take jurisdiction in this case, and SSA simply had no say in the matter. (In re Aaron S. (1991) 228 Cal.App.3d 202, 278 Cal.Rptr. 861.) Additionally, it is irrelevant that Stephanie had not already arranged for S.'s care at the time of her incarceration. Instead, the issue is whether, as of the time of the jurisdictional hearing, she could arrange for the care. (In re Aaron S., supra, 228 Cal.App.3d at p. 208, 278 Cal.Rptr. 861.)
But even assuming counsel's characterization of the law was a mere misstatement, and he actually understood its specific requirements, the record also demonstrates there could be no satisfactory explanation for his failure to raise the issue. Stephanie had not one, but two sisters who had expressed an immediate willingness to take S. in the wake of her incarceration. One of them, Shalonda, flew out from Missouri to seek custody of S. at the detention hearing, and immediately thereafter took S. back to Missouri with her. The record strongly suggests she remained willing to take S. during the entire pendency of this case. Those facts alone would be sufficient to compel a conclusion that Stephanie was in a position to arrange for S.'s care.
Although SSA concedes the record demonstrates Stephanie had contact with both of her sisters shortly after S. was detained, it nonetheless argues there was no evidence Stephanie actually offered any specific plan for S.'s care during her incarceration. Without such a plan in evidence, SSA asserts there was no basis for Stephanie's counsel to argue the point, and thus no basis for us to conclude the representation was ineffective. There are three very significant flaws in that argument.
First, the issue to be determined in this case under section 300, subdivision (g) was whether Stephanie could arrange for care, not whether she had already done so. There was certainly ample evidence in the record to demonstrate that Stephanie could have made those arrangements with either one of her sisters. Even John had offered his mother as a placement by the time of the hearing.
Additionally, even assuming it was SSA, and not Stephanie, who specifically made the arrangements for S.'s care with Shalonda, the obvious inference is that it was through Stephanie's contacts, and not pure chance, that SSA was able to get in touch with that sister. Indeed, the record here demonstrates that from the beginning, Stephanie was telling SSA she wanted S. to live with her Missouri sister until Stephanie got out of jail.
Second, SSA, and not Stephanie, had the burden of proof as to each fact necessary to sustain the jurisdictional petition. Thus, SSA had the initial burden of establishing that Stephanie could not arrange for S.'s care. Stephanie was not required to demonstrate anything, and she might *526 have prevailed without making any factual showing at all. In fact, on this record, we would have no problem concluding that SSA failed to sustain its factual burden.
Third, SSA's argument implicitly suggests that Stephanie's attorney had no obligation to consider this issue unless Stephanie herself first took action to indisputably establish its factual basis. As we have already noted, however, that is not the way the attorney-client relationship works. It is the attorney's role to analyze the client's legal position and suggest a strategy or recommend issues that should be explored. In this case, even if there were not already significant evidence of family members ready to step in, the obvious question for the attorney to raise was "do you have someone who can care for S. while you are in jail?"
Nothing in section 300, subdivision (g) even requires an incarcerated parent such as Stephanie to prove affirmatively the suitability of her caretaking arrangements. It requires only that she be able to make the arrangements. If SSA wishes to challenge the suitability of those arrangements, it must proceed under a different clause of subdivision (g), providing that jurisdiction is also appropriate where "a relative or other adult custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child, the whereabouts of the parent are unknown, and reasonable efforts to locate the parent have been unsuccessful." Of course, the fact that this provision requires not only proof of an unsuitable placement, but also that the parent cannot be located, suggests that even if the initial arrangements do not work out, an incarcerated parent (who certainly could be located) would have the opportunity then to make other arrangements.

II
Finally, in the circumstances of this case, we cannot agree with SSA's contention that the claim of ineffective assistance was waived as a matter of law. SSA relies upon In re Meranda P. (1997) 56 Cal. App.4th 1143, 1150, 65 Cal.Rptr.2d 913, for the proposition that "an unappealed disposition or postdisposition order is final and binding and may not be attacked [by a claim of ineffective assistance of counsel] on an appeal from a later appealable order." However, Meranda P. speaks only in generalities, arguing in the abstract that due process will usually be protected even if the court enforces a waiver of ineffective assistance of counsel in a prior phase of the case.
As explained in In re Janee J. (1999) 74 Cal.App.4th 198, 208, 87 Cal.Rptr.2d 634, the Meranda P. rule is not absolute. "[T]he crux of Meranda P. [is that] the waiver rule will be enforced unless due process forbids it. The case conceded `the critical role in ensuring an accurate and just decision played by a capable appointed counsel' (Meranda P., supra, 56 Cal. App.4th at p. 1155, 65 Cal.Rptr.2d 913) but noted `significant safeguards built into this state's dependency statutes which tend to work against the wrongful termination of a parent's right to a child even though a parent may be unrepresented or poorly represented' (id. at p. 1154, 65 Cal.Rptr.2d 913). Those safeguards include a focus on return of the child during the reunification period, independent judicial review every six months, and notice to a parent of all proceedings and the right to counsel at all stages. (Id. at pp. 1154-1155, 65 Cal. Rptr.2d 913.) Thus in the usual case, application of the waiver rule will not offend due process."
This case, however is not that usual one. As we have explained, the record demonstrates the error here was entirely legal, *527 and quite fundamental. Stephanie's counsel simply misunderstood the statute and neglected to assert her right to control S.'s placement, and thus to defeat jurisdiction. As pointed out in In re Eileen A., supra, 84 Cal.App.4th. at p. 1258, 101 Cal.Rptr.2d 548, the parent is hardly in a position to recognize, and independently protest, her attorney's failure to properly analyze the applicable law. If we had some reasonable expectation that parents could do so, we would not need to hire attorneys for them at all. The fact of the matter is, Stephanie was in jail, relying upon her counsel to spot the holes in SSA's legal position. He simply failed to do so, and instead essentially conceded the sufficiency of SSA's pleading and the applicability of section 300, subdivision (g) at the jurisdictional hearing.
Additionally, at least one court has held that counsel's failure to point out the inadequacy of a petition at the jurisdictional hearing would waive the defect for purposes of appeal as well. (In re Shelley J. (1998) 68 Cal.App.4th 322, 328, 79 Cal. Rptr.2d 922, but see In re Alysha S. (1996) 51 Cal.App.4th 393, 58 Cal.Rptr.2d 494.) Thus, if we were to conclude that Stephanie's only appellate remedy to challenge the jurisdictional issue was a direct appeal from that order, an appeal which is arguably waived by virtue of that very same ineffective assistance, we might be implicitly concluding she has no real remedy at all, i.e., that the error, once made, is irremediable.
And in the circumstances of this case, none of the "significant safeguards built into this state's dependency statutes which tend to work against the wrongful termination of a parent's right to a child even though a parent may be unrepresented or poorly represented" (Meranda P., supra, 56 Cal.App.4th at p. 1154, 65 Cal.Rptr.2d 913) was of any assistance. Counsel here had one job: to defeat jurisdiction. The law and the evidence were both on Stephanie's side. Counsel's failure under the circumstances essentially denied Stephanie the right to contest jurisdiction. And that error was determinative, because the simple fact of Stephanie's incarceration prevented her from reunifying with S. within 18 months. Neither the presumption favoring family reunification, nor the regular review hearings every six months, nor the caliber of her representation in those latter phases of the case was ever going to change the fact that her incarceration prevented her from timely reunifying. Her inability to reunify required this case to go to a section 366.26 permanency hearing, and once there, the court was statutorily obligated to select adoption as the permanent plan for S., who was indisputably adoptable. None of the "safeguards" built into the system could derail this case once counsel's initial error sent it down the dependency track.
Moreover, there is not even a hint in our record that Stephanie herself was ever put on notice that her ability to arrange placement was significant,[5] or had any reason to know of her counsel's error. Because counsel's own statement reveals he misunderstood the law from the outset, we cannot indulge in any inference he explained it to Stephanie correctly. It also appears that none of the other participants recognized the problem at any point in the trial court proceedings. In fact, we must presume that if either county counsel, representing SSA, or the court had recognized the problem, they would have brought it to *528 light, as neither the court nor SSA has any legitimate interest in creating or maintaining unwarranted dependency jurisdiction.
Consequently, we simply have no basis upon which to impute knowledge of the problem to Stephanie herself, and no basis to conclude she could reasonably have been expected to complain about it earlier. In that respect, this case is similar to In re Jessica G. (2001) 93 Cal.App.4th 1180, 113 Cal.Rptr.2d 714. In Jessica G., the court appointed a guardian ad litem for the mother, at the request of mother's counsel. Mother was present at the hearing, but no one explained to her what a guardian ad litem was, or how it might affect her participation in the casein fact, both the court and counsel referred to the guardian as a "G.A.L.," without even identifying what that was. (Id. at pp. 1189-1190, 113 Cal.Rptr.2d 714.) Although mother could have challenged the guardianship by a writ, she did not. Instead, she waited to challenge the appointment as part of her appeal from the order terminating her parental rights.
The Department of Children and Family Services' principal argument on appeal was that the issue had been waived because of the mother's failure to bring the writ. However, the appellate court flatly rejected that contention: "How could Mother have done so? Her attorney looked to the guardian ad litem, and that person could hardly be expected to endorse a writ questioning the legality of her appointment. Mother was in a Catch-22 situation in which she had a bare remedy with no real knowledge or ability of how to use it and no attorney to whom she could turn to effect it. Insisting that she take a writ at that point or lose her right to later complain about violation of her constitutional rights would itself pose constitutional issues." (In re Jessica G, supra, 93 Cal.App.4th at p. 1190, 113 Cal.Rptr.2d 714.)
We agree with the Jessica G. court. In the absence of some evidence to support an inference that Stephanie, and not merely her counsel, should have known of the issue, we have no basis to find her complied in its waiver. Instead, we can only infer that any failure to raise the issue earlier was also due to ineffective assistance of counsel.
Finally, unlike Meranda P., we can discern no detriment in allowing Stephanie to raise the ineffective assistance issue at this time. In justifying its refusal to consider the belated claims of ineffective assistance, the Meranda P. court relied heavily on the fact that doing so might delay resolution of the case, and thus stability for the child, an additional 14 months. The court explained that "[o]f the many private and public concerns which collide in a dependency proceeding, time is among the most important." (In re Meranda P, supra, 56 Cal. App.4th at 1152, 65 Cal.Rptr.2d 913.)
Here, the essential posture of the case has changed not a whit since the original jurisdictional hearing. S. is currently living with Shalonda, the very place he would apparently have gone if Stephanie's right to arrange care had been timely raised. And although Shalonda is now willing to adopt him, her preference is to allow Stephanie to maintain her own relationship with him. Thus our reversal of the jurisdictional determination, even at this late date, would actually restore this case to the point it likely would have reached if counsel had asserted Stephanie's right to arrange for care in the first place: i.e., S. would be in Shalonda's care during the remaining period of Stephanie's incarceration.
Meranda P. acknowledges that the purpose of due process is to ensure "fundamental fairness." (In re Meranda P, supra, 56 Cal.App.4th at 1151, 65 Cal.Rptr.2d 913.) In the circumstances of this case, *529 depriving Stephanie of the right to correct her counsel's erroneous concession of the key legal issue would certainly be inconsistent with fundamental fairness. Simply put, Stephanie's counsel gave away her case, despite the fact that both the law and the facts seemed to support her position. None of the protections offered to her during the later phases of the case could ameliorate that initial error. And Stephanie was utterly dependent upon the skill of subsequent counsel to recognize, and finally expose the error on appeal. In the absence of strong countervailing considerations, which are not present here, we will not perpetuate the error by indulging in the fiction that Stephanie intended to waive it.

III
The arguments offered by S.'s own counsel are no more persuasive than those of SSA. She contends the petition was sufficiently pleaded because it included a count based upon section 300, subdivision (b). However, her argument simply ignores the fact that count was dismissed. The only basis for jurisdiction in this case was section 300, subdivision (g). Consequently, the dependency can only be sustained if that count was properly pleaded and proven. It was not.
S.'s counsel otherwise argues that S.'s best interests are served by allowing his aunt to adopt him. Counsel believes he is happy and well-cared for in his aunt's home, and that she will provide him with a more stable long-term home than Stephanie would be able to. Those arguments, however, are simply not relevant to the issues of whether jurisdiction was proper in the first instance, and whether Stephanie's counsel was ineffective in failing to raise that issue. We do not remove children from their homes merely because we think the state can find a better one.

IV
Having determined that SSA failed to sustain its burden of either pleading or proving an essential element of its jurisdictional petition, and that Stephanie's counsel was ineffective for failing to point out that fact at the time, we must determine the proper remedy. The obvious temptation is to simply dismiss the petition now, and send everyone on their way. The problem with doing so, however, is we cannot simply unwind a juvenile case and presume that circumstances cannot have changed in the interim. They always do.
As explained in In re Eileen A., supra, 84 Cal.App.4th at p. 1259, 101 Cal.Rptr.2d 548, "a reversal of an order freeing a child for adoption because of ineffective assistance necessarily entails what would be, in effect, an `updated review hearing' in which the court would consider the child's `current status.'" Thus we cannot simply order the petition dismissed without some determination that S.'s care would continue to be assured.
We must therefore remand this case to the trial court to determine whether, at the current time, there is a basis for amending the petition to plead, and then prove, that neither Stephanie nor John (who is now back in the game) is available to take custody of S. due to their incarceration, and that neither is able to arrange for his care during the remainder of their joint incarceration period. If SSA can plead and prove those facts now, there is a basis for yet sustaining this petition. However, if either parent is now available and willing to assume care of S., or even assuming Stephanie and John are both still incarcerated, if one of them is able to make arrangements, with Stephanie's sister or some other person, to provide care for S. during their incarcerations, then the petition must ultimately be dismissed.
*530 The judgment terminating parental rights is reversed. The case is remanded to the trial court with instructions to determine whether, based upon the facts currently in existence, a jurisdictional petition based upon section 300, subdivision (g) can be properly pleaded and proven.
WE CONCUR: ARONSON and FYBEL, JJ.
NOTES
[1] S. has a very unusual and perhaps unique first name. Were we to use that name in this opinion, it would likely undermine the confidential nature of the proceeding. Consequently, we refer to him only by the initial.
[2] Although John's lack of availability was voluntary; he apparently made a quick exit from the jurisdiction to avoid being arrested himself.
[3] All further statutory references are to the Welfare and Institutions Code.
[4] All further statutory references are to the Welfare and Institutions Code section 300, unless otherwise indicated.
[5] SSA's reports acknowledge that prior to the jurisdictional hearing, Stephanie told the social worker she wanted S. to be placed with Shalonda, but do not suggest the social worker ever revealed that Stephanie's ability to make that placement happen might make a difference.