Filed 10/13/20  In re R.B. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re R.B., a Person Coming Under the Juvenile Court Law. | B300908 (Los Angeles County Super. Ct. Nos. 17CCJP00233, 17CCJP00233A, CK43695, DK08759, XK03343) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. D.B., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Nancy A. Ramirez, Judge.  Affirmed.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

This appeal arises from the second dependency case involving father D.B., mother S.R., and their young child, R. In this case, the juvenile court exercised jurisdiction over R. pursuant to Welfare and Institutions Code section 300, subdivision (b),[1] based on an incident involving mother. At the time of the combined 12- and 18- month review hearing, father had substantially complied with his case plan and was having extended unmonitored visitation with R. However, shortly before the hearing, father was incarcerated after he pled guilty to felony domestic battery by strangulation. The juvenile court denied father's request to return R. to his custody, finding a substantial risk of detriment to R. based on father's recent incarceration. The court also denied further family reunification services for father. Father appealed.

We affirm. The court's finding that returning R. to father's care would create a substantial risk of detriment to R. was supported by substantial evidence. We further conclude that the juvenile court did not abuse its discretion in finding that there were no exceptional circumstances justifying further reunification services to father, or requiring unmonitored visitation.

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

## BACKGROUND

*Prior Proceedings*

Mother and father have one child together, R., born in 2014. Father has two older children from a prior relationship; the oldest child was adopted by the paternal grandfather after father's parental rights were terminated.[2]

The Los Angeles County Department of Children and Family Services (DCFS) filed a petition in December 2014 under section 300, subdivision (a), and an amended petition on July 30, 2015 adding additional counts under section 300, subdivision (b)(1). The petition alleged in paragraph a-1 that father and mother engaged in a violent altercation in which father struck mother's head with a gun. The petition noted that mother (then 17 years old) was "a child herself" and had previously exhibited impulsive behavior including running away; she also lacked parenting skills and left R. with "unrelated and related adults." In paragraph b-1 of the amended petition, DCFS alleged that mother endangered R. when she ran away from her current placement with R. (then one month old), and that mother's and R.'s whereabouts were unknown. Paragraph b-3 alleged that in June 2015, R. was exposed to a violent confrontation between mother and maternal grandfather, in which mother threw punches at maternal grandfather while he was holding R. The petition further alleged that mother attempted to break the window of maternal grandfather's home while "screaming irrationally and uncontrollabl[y]." Paragraph b-4 alleged that father failed to provide R. with basic necessities, including food,

_____

[2]R. is the only child subject to this appeal. Mother is not a party to this appeal. We therefore include only limited details related to mother.

clothing, shelter, and medical treatment. Paragraph b-5 alleged that mother medically neglected R. by failing to provide the child with age-appropriate immunizations and by leaving R. with paternal grandfather, who was not able to authorize R.'s medical care.

The court sustained the petition and the family had an open dependency case from March 2015 to October 2016. During that time, mother received family reunification services and then family maintenance services. DCFS reported that father never made an appearance in court. In January 2016, the court denied reunification services for father. The court terminated jurisdiction in October 2016, awarding full custody to mother.

*Current Petition and Detention Report*

DCFS received another referral on September 9, 2017, after mother was found passed out in her car, with two-year-old R. sleeping next to her. The reporting party stated that mother appeared to be under the influence of a substance, which mother denied. R. was found "playing with a pink pepper spray." Mother and R. were taken into custody at the Long Beach Police Department. According to responding police officers, mother was homeless, hallucinating, and making nonsensical statements.

A DCFS children's social worker (CSW) transported R. for a medical examination and then to placement. She observed that R. was "destructive and defiant." The CSW spoke to maternal grandmother, who reported that mother had been shot in February 2017, which caused her to hallucinate. According to maternal grandmother, mother had been shot eight times, in the stomach, back, and mouth. DCFS reported that maternal grandmother had a history with the department and mother was currently a non-minor dependent in foster care. The CSW also

4

met with mother, who was in the hospital.  Mother denied any abuse to R. and denied substance use, other than marijuana and prescribed medication.  Mother reported that father lived in Las Vegas, Nevada, but said she did not have his contact information.

DCFS filed a section 300 petition on September 12, 2017 regarding R., who was detained in foster care.  The petition alleged a failure to protect under section 300, subdivision (b)(1).  Specifically, paragraph b-1 alleged that mother had mental and emotional problems, including diagnosed bipolar disorder, anxiety, mood disorder, and visual hallucinations, and that mother failed to take her prescribed psychotropic medication, endangering R.'s health and safety.  Paragraph b-2 alleged that mother had a history of substance abuse, was currently abusing marijuana, and had been under the influence of marijuana while caring for R.

At the detention hearing, the court found a prima facie case for jurisdiction over R. pursuant to section 300, and no reasonable means available to protect R. without removing him.  The court therefore removed R. from mother, with monitored visitation for mother and maternal grandmother.  The court also ordered DCFS to attempt to locate father.

*Jurisdiction and Disposition*

In its jurisdiction/disposition report filed October 4, 2017, DCFS reported that it had located father and informed him of the proceedings.  Mother told DCFS that father last had contact with R. when the child was a newborn.

The CSW met with mother at her residential facility on September 28, 2017.  Mother reported that she was seven or eight months pregnant when the father of her unborn child (not father here) and his girlfriend shot her.  As a result of the

shooting, mother lost the baby, is deaf in one ear, and has a metal plate in her head. Mother confirmed that she was diagnosed with bipolar disorder, anxiety, and mood disorder, but denied having hallucinations, other than when she was on morphine in the hospital following the shooting. She denied being passed out in the car with R. and stated R. was not playing with pepper spray during that incident. Mother also denied alcohol and drug use. The CSW noted that mother's speech was slurred at times, seemingly from injuries from the shooting, and she could be difficult to understand. Mother also denied that father ever hit her.

The court held the adjudication hearing on October 4, 2017. Father did not appear. The court ordered R. to remain in foster care, with overnight visits for mother, and continued the hearing to the following month.

In November 2017, mother's case manager reported to DCFS that the facility where mother was staying was trying to remove her, due to several incidents in which she was belligerent and cursed at staff. Mother also left the facility for several hours on October 25, 2017, leaving R. (who was visiting) in the facility's daycare; when mother returned, staff reported she appeared to be under the influence.

DCFS also reported that father contacted the department on October 25, 2017 and requested a return call. However, father had "not maintained any type of consistent contact" with DCFS. DCFS recommended that if father appeared at the next hearing, the court order six months of family reunification services for father and require him to complete services including domestic violence counseling, parenting classes, and individual therapy.

Father appeared at the continued adjudication hearing on November 1, 2017. Father's counsel told the court that father had ongoing contact with R. and R. had resided with father during certain periods. Mother confirmed to the court that father had a relationship with R. and had been visiting the child. The court noted that father was non-offending under the current petition and ordered DCFS to conduct an investigation regarding releasing R. to father. The court also ordered monitored visitation for father. The court continued adjudication to December 7, 2017.

DCFS filed a first amended petition on November 30, 2017. The petition added paragraph b-3, alleging that father had a history of substance use and a criminal history including arrests for driving under the influence and felony narcotics convictions. DCFS further alleged that father's criminal history placed R. at risk.

Father spoke with DCFS on November 30, 2017 and denied having any incidents of domestic violence with mother. He stated that he had been in R.'s life ever since R. was born, visited R. when father came to California, and that mother sometimes sent R. to visit him in Nevada. Father wanted to have R. placed in his care. DCFS recommended the court deny releasing R. to father at his residence in Nevada or at paternal grandmother's residence in California. DCFS noted that father had been cooperative and allowed the department to assess his home, but it had concerns about father. DCFS noted that father admitted his criminal history, but denied that he was responsible for any of his arrests, including time spent in prison. Further, none of father's three children was in his care.

At the continued hearing on December 7, 2017, counsel for DCFS moved to dismiss count b-2. As to count b-3, DCFS and father had reached an agreement that the department would dismiss that count, making father non-offending. Father agreed that R. would not be placed with him and he would comply with the conditions outlined in his case plan. Father's counsel told the court that father was in a "difficult position" because of the prior sustained petition alleging domestic violence, but father claimed he never received "any notification" of that petition and was "not able to defend himself" during the prior proceedings. However, father agreed to participate in the case plan because he wanted "to show the court that he's serious" about regaining custody of R.

Accordingly, the court sustained count b-1, amended to strike the reference to mother's visual hallucinations, finding jurisdiction over R. by a preponderance of the evidence under section 300, subdivision (b). The court dismissed counts b-2 and b-3. The court also approved father's case plan, which included counseling, a domestic violence program, on-demand drug testing, and monitored visitation with DCFS discretion to liberalize. The court continued the disposition hearing.

At disposition on January 4, 2018, the court found by clear and convincing evidence that removal of R. from mother and father was necessary and that DCFS made reasonable efforts to prevent removal. The court ordered family reunification services, including continued monitored visitation for father.

*Status Review*

In June, 2018, DCFS reported that R. was doing well in the care of R.W., a non-relative extended family member. Father had not provided DCFS with any information regarding his participation in court-ordered programs. Father had

8

videoconference visits with R. and visited R. a few times when he was in town; DCFS reported that those visits went well. DCFS assessed the family as "high risk" and concluded that neither mother nor father were in full compliance with their case plans.

Father enrolled in a 52-session domestic violence program on April 13, 2018. He also enrolled in an approved parenting class in July 2018. Mother and father both attended a monitored visit with R. on July 12, 2018. The CSW observed that mother interacted with R., but father "sat on the couch and did not interact" with the child. A few days later, R.W. reported that she was considering seeking to remove R. from her care due to the child's behavior and mother's constant accusations regarding her care of the child. R.'s daycare provider also reported that his behavior was "out of control." R. was placed in another foster home on July 23, 2018.

At a hearing in August, 2018, the court found both parents were in partial compliance with their case plans. However, as to father, the court found that DCFS failed to comply by providing services to enable R.'s safe return home. The court continued reunification services and monitored visitation for both parents, with some unmonitored visits for mother.

In a September 2018 report, DCFS stated mother had been visiting R. weekly. DCFS also outlined its efforts to set up phone visitation between R. and father, but that father only had one seven-minute call with R. since July 23, 2018. Father had also agreed to contact DCFS whenever he was in Los Angeles to schedule in-person visitation. When he had not done so between July 31 and September 5, the CSW contacted father. Father stated that he was in Los Angeles, set to return to Las Vegas in two days. When the CSW asked why father had not contacted

DCFS, father stated he was "tired of trying" and it was "too much stress for me."

As of late July, father had completed 13 sessions of his required 52-week domestic violence course, but was unable to continue because the program closed. Father insisted he had completed additional sessions but refused to contact the program himself. DCFS reported that father enrolled in a new domestic violence course and had 38 classes remaining. Father also submitted proof of completion of six parenting class sessions. DCFS concluded that since the last court date, father "has showed minimal effort and reported to CSW that he will just fight for custody in Family Court. . . . It has continued to be a constant struggle for [father] to comply." Father had no in-person visits with R. during this period, and waited until September 17, 2018 to have one phone visit and re-enroll in his domestic violence class. As such, DCFS told the court that father was partially in compliance with the case plan and putting forth "minimal effort."

In January 2019, DCFS reported that it was in the process of placing R. with paternal great-aunt, N.G.[3] DCFS reported that during the review period, father "made minimal effort" to visit R., nor had he "been able to commit or even verbalize a possible visitation schedule." Although father continued to work on his case plan, he "shows minimal effort to keep the bond and communication with R." DCFS detailed multiple discussions with father in September and October 2018, during which father refused to obtain individual counseling because he had already

[3]The record refers to N.G. alternately as paternal aunt and paternal great-aunt. Because she is father's aunt and R.'s great aunt, we refer to her herein as paternal great-aunt.

10

participated (with an unlicensed provider) and he felt he "does not need it." Father only had one visit with R. on January 3, 2019, and failed to follow the telephonic visitation schedule or to coordinate with DCFS to set up additional visitation.

At the scheduled 12-month review hearing on February 5, 2019, counsel for both mother and father requested a contested hearing. The court continued the hearing, setting a contested, combined 12- and 18-month review hearing.

DCFS filed an interim review report on February 27, 2019, reporting that R. was placed with paternal great-aunt on February 11. Father signed the telephonic visitation schedule on February 12, 2019 and agreed to follow it. Paternal great-aunt reported that from February 11 to 22, father had called approximately four times per week and visited twice, and that the visits were positive. According to DCFS, father had completed his domestic violence and parenting class requirements. Father continued to insist that he did not need mental health services, but agreed to complete a mental health evaluation. In the report, DCFS concluded that father was partially in compliance, but it was "too soon to determine whether he will maintain consistency." DCFS recommended continued family reunification services for both parents.

At the continued hearing on March 7, 2019, counsel for DCFS stated that the department was recommending further reunification services for mother, but had no basis to recommend further services for father. DCFS also recommended continued monitored visits for father, with discretion to liberalize. DCFS counsel informed the court that father had not completed individual counseling and "has had very little personal contact" with R.

Father testified that he talked to R. by telephone or through FaceTime "every day" and visited whenever he was in Los Angeles. He testified that in the past month he had visited once every other week and tried to stay at paternal aunt's house for "at least five hours." Father disputed the report from R.'s prior caregiver that he only contacted R. a few times; as proof, he submitted evidence of text messages between father and the caregiver. Father testified that he only saw R. in person once or twice during this period. He also admitted that there were times he came to Los Angeles and did not try to see R., as he claimed it did not always work with his schedule.

DCFS noted to the court that both parents recently had shown more compliance and willingness to contact the CSW, but that father had been extremely resistant to individual counseling until the past month or so. She argued that father made comments to the CSW, such as blaming the mother for the case, which suggested that R. was not yet able to be safely in father's care. The court stated it was impressed with the progress made by both parents and ordered continued family reunification services, with "stepped up" visitation for both parents, pending the outcome of father's counseling intake appointment to see if he needed ongoing counseling. The court indicated it hoped by the next hearing that R. could be released to one or both parents, and ordered DCFS to assess father's home in Nevada in the meantime. The court also ordered DCFS to initiate an Interstate Compact on the Placement of Children (ICPC) request with Nevada.

A CSW conducted a home assessment of father's home in Nevada on April 9, 2019. Father lived with his pregnant fiancée and his seven-year-old son, Ri. Father told the CSW that he did

not have a job and was able to care for the children. DCFS reported that father completed his mental health intake and the therapist indicated that father did not present any mental health symptoms leading to a mental health diagnosis. Paternal great-aunt told DCFS that father had complied with the telephonic visitation schedule and completed overnight stays at her home.

At the next hearing date on April 18, 2019, DCFS requested a continuance pending the results of the ICPC. Both mother and father requested an immediate home-of-parent order. DCFS objected, arguing that father had not always been compliant, "spent time not coming to court, not participating," had "stonewalled" DCFS and "sidestepped" requirements, and stated that "he would wait out this process and get custody of the child at the end of it." DCFS also argued that father's conduct had not demonstrated that he had changed "behavior that is dominating and controlling towards mother." Counsel for DCFS also noted that father previously told the court that his work schedule in Nevada prevented him from setting up a visitation schedule for times he was in Los Angeles, but father told the ICPC evaluator and social worker in Nevada that he did not have a job. The court granted the continuance and declined to issue a home-of-parent order. In early May, the court granted father's request to start week-long visits with R. at his home in Nevada.

DCFS filed an interim review report on May 31, 2019, noting that the partial live scan results for father's fiancée included a misdemeanor arrest in 2015 for prostitution. The fiancée stated that she pled no contest and had changed her life completely since that time. According to DCFS, father continued to provide conflicting information, to blame DCFS and mother for "everything he is going through," and to "display[] anger towards

13

everyone." DCFS stated it remained concerned with father's lack of disclosure and inconsistent behavior, but recommended continuing family reunification services for both parents.

Mother informed DCFS on June 17, 2019 of an injury R. suffered to his forehead. Mother discovered the injury the day before, when she picked R. up from paternal great-aunt for a visit. According to mother, paternal great-aunt stated that R. was injured in father's care, but she provided minimal information about what occurred. Mother was upset that she was not notified previously. The CSW contacted paternal great-aunt, who stated that R. fell while playing and that father took R. to the doctor. Father told the CSW that the injury occurred on June 9 while R. was running and attempted to jump over something. Father stated he took R. to the hospital and R. was treated for his head wound.

In a last-minute information, DCFS reported that the ICPC request for a home study in Nevada was denied. According to the denial letter, father and his fiancée were evasive in disclosing their complete background history. In addition, the preliminary background results for both father and his fiancée had several significant issues including disqualifying factors, and they failed to provide required documentation, resulting in denial of the home study. DCFS also reported additional live scan results for father's fiancée, including a 2014 misdemeanor conviction for prostitution, a 2017 misdemeanor conviction for battery, and a 2017 felony conviction for receipt of stolen property. Father's fiancée confirmed that she was currently on formal probation for the felony. Due to her criminal record within the past five years, the ICPC was denied. DCFS stated it continued to be concerned about R.'s safety under father's care, and recommended

terminating reunification services for father.

In another last-minute information, DCFS detailed the parents' recent visitation. As to father, DCFS reported that father had been consistent in picking up and dropping off R. for his week-long visits in Nevada. Father agreed not to leave R. alone with his fiancée, although he disagreed with that decision. Father told the CSW that he did not want to discuss parenting with mother. Father also sent DCFS a video purportedly concerning mother's behavior in the court waiting room on the day of the last hearing. According to the CSW, the video showed father ignoring mother's inquiries regarding R.'s injury and referring mother to the CSW; mother also reacted inappropriately to father.

The court again continued the hearing on June 18 and July 18, 2019, but indicated there would be no further continuances. Father was not present at the July hearing, but his counsel requested the continuance so that he could attend. The court also ordered DCFS to submit a supplemental report assessing the quality of the overnight visits with R. and including an interview with R.

DCFS filed a last-minute information on August 20, 2019, reporting that father attended all of his scheduled extended visits starting May 13, 2019. Paternal great-aunt told DCFS that R. appeared happy and excited to visit father and R.'s half-brother, Ri. However, the CSW had not had any contact with father since the last hearing on July 18, 2019. When the CSW attempted to contact father's fiancée, she provided father's email address but gave no further response.

After additional investigation, DCFS discovered that father was arrested on July 7, 2019 and charged with felony domestic

battery by strangulation. Father entered a guilty plea on August 1 and his sentencing was scheduled for October 22, 2019. The victim (who was neither mother nor father's fiancée) told the responding officers from the Las Vegas Metropolitan Police Department that she and father had been dating since April 2017. For several days prior to the incident, she had been trying to get father to retrieve his belongings from her apartment, but he had been sending her threatening text messages. On the morning of July 7, she returned home and found father there. Father made threatening remarks to the victim and then punched her in the face with a closed fist at least five times. After that, father got on top of the victim and choked her with both hands around her throat. She stated that she was unable to breathe and feared she would lose consciousness. Father got up and went to the kitchen, where the victim feared he would get a kitchen knife. The victim took that opportunity to leave the apartment to seek help. In the police report, the responding police officer observed that the victim was very upset and afraid, with scratches and bruising to her neck and throat, swelling to her nose, and swelling and bruising to her right cheek.

DCFS also interviewed R. on July 20, 2019. R. appeared healthy, talkative, and smiling. He stated that he wishes to live with mother, father, and his paternal great-aunt. R. said that he liked going to father's house.

In a last-minute information on August 29, 2019, paternal great-aunt reported that father had telephone calls with R. on August 12 and 14, both lasting approximately three to five minutes. Father told R. he missed him.

In a second last-minute information, DCFS reported that father had two pending criminal cases in Nevada: the felony

16

domestic battery by strangulation and a probation violation. Father's defense attorney in Nevada confirmed that father pled guilty to the domestic battery charge and was awaiting sentencing. Father spoke with the CSW on August 22. Father stated he entered a guilty plea in order to get released and he planned to "obtain a lawyer and fight the case." Father claimed the victim falsely accused him of the charges because she found out that he had a fiancée and a baby on the way.

The court held the continued 12- and 18-month review hearing on August 29, 2019. Mother testified and requested an order returning R. to her home. Mother's counsel stated that mother agreed with the DCFS recommendation to terminate father's reunification services, given his incarceration and the "egregious nature of the crime."

Father's counsel requested that the court make a home-of-father order, "with the objective that father would make an appropriate plan with current caregiver and paternal great aunt" to care for R. during father's incarceration. Alternatively, he asked the court to find that exceptional circumstances warranted a further continuance of his family reunification services pursuant to section 352. He argued that DCFS's concern with father's refusal to disclose his source of income, as well as his fiancée's criminal history, were insufficient to establish a risk of harm to R. He noted that he was non-offending in the petition and for the last several months had been having alternating week-long visits with R. without any issues, other than one injury.

With respect to father's recent arrest, his counsel argued that "we don't have sufficient evidence of, one, whether the incident occurred as described; or two, even if the incident did

17

occur, and as father reported to the worker, he denies it does, that that incident is sufficiently tied to any risk of harm to R[.] to justify a detriment finding today." He also noted that this "alleged incident" occurred when R. was not in father's care, and that father "intends to fight the charges." Finally, he requested that the court retain the current visitation schedule, noting that father had positive telephonic contact with R. while incarcerated. Father also agreed with DCFS's recommendation against a home-of-mother order.

R.'s counsel agreed that both parents had made "great strides," and had been enjoying extended unmonitored visits without incident. However, he acknowledged that recent events "set this case back a little bit." Given father's arrest for a violent crime, he argued it would be premature to send R. home with father. He also opposed a home-of-mother order. Instead, he argued that the court should continue family reunification services for both parents, suggesting that "both parents are very close to reunifying."

Counsel for DCFS argued that there were no exceptional circumstances applicable to father. She cited to father's past behavior: "he delayed his compliance with the case plan. He consistently has been evasive with the social worker. Has caused the social worker to go to great lengths to determine information that could have been identified by father simply answering questions that the social worker asked." Further, she stressed the fact that father committed a violent crime, to which he pled guilty, "only reinforces the concerns that the social worker has been expressing since she first started writing reports in this case that father is someone who does exhibit dominant, controlling, manipulative behavior. That he does not contain his anger. And

18

that [his completion of courses] was not effective in addressing the very concerns that led to the court ordering that case plan disposition in the first place." She also noted DCFS's ongoing concern with father's "periodic . . . demonstration of his disdain for mother. His disregard for any need to co-parent with her," including blaming mother for his case plan and "for the case existing." She acknowledged that father did comply, "belatedly, partially, and on his own terms with the case plan," but that his recent conviction for battery by strangulation of an intimate partner demonstrated that he "he did not benefit from those services." DCFS did not object to further reunification services for mother, given her circumstances as a non-minor dependent and a victim of a violent crime.

The court first noted that prior to the most recent reports, both "parents had been doing very well and were in complete compliance with their case plans." The court continued: "However, the court is very concerned with the most recent developments. In particular, in regard to father, that he has pleaded guilty to domestic battery by strangulation. That's a felony charge that he is currently incarcerated [*sic*]. And he has sentencing October 22 in Nevada. The court is concerned about that development and cannot release the child to the father because he is not home, he is incarcerated." The court concluded that it was "terminating family reunification services and is not ordering the child to be released to him given his most recent incarceration." The court also refused to release R. to mother, based on recent reports that she might have been under the influence and lacked stable housing. Thus, the court found that returning R. to his parents' custody would create a substantial risk of detriment.

19

The court also found that mother and father had made "substantial" progress toward alleviating or mitigating the causes necessitating placement. Citing the exceptional circumstances of mother's case, the court continued mother's family reunification services for another six months, finding a substantial probability that R. would be returned to mother's custody in that time and mother made substantial progress in her case plan despite facing multiple challenges. However, the court terminated reunification services for father, finding there was not a substantial probability that R. would be returned to his custody and safely maintained in his home within six months, because father had not "demonstrated the capacity and ability to complete the objectives and to provide for the child's safety, protection, physical, and emotional well being." The court ordered monitored visitation for father, with telephonic unmonitored visits while father was incarcerated.

Father timely appealed.

## DISCUSSION

Father asserts three issues on appeal. First, he argues that the juvenile court's finding of a risk of detriment to R. based on father's incarceration was insufficient to justify keeping R. out of father's custody. Second, he contends the court abused its discretion when it denied his request to continue his family reunification services. Finally, he argues that the court abused its discretion in ordering monitored visitation. We address these contentions below.

I.  *Substantial Evidence Supports the Court's Finding of a*
    *Risk of Detriment*

Father asserts that substantial evidence did not support the court's finding that returning R. to his custody would create a

20

substantial risk of detriment.  We disagree.

At both the 12- and 18-month review hearing, the juvenile court is required to order the return of a minor to the physical custody of the parents unless it finds that such return "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§§ 366.21, subd. (f)(1) [12–month review], 366.22, subd. (a)(1) [18–month review].) The burden is on DCFS to establish such detriment by a preponderance of the evidence. (§ 366.22, subd. (a)(1); *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).)  The trial court is required to specify the factual basis for a finding of detriment.  (§§ 366.21, subd. (f)(2), 366.22, subd. (a)(2).)

"[T]he question whether to return a child to parental custody is dictated by the well-being of the child at the time of the review hearing."  (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 900.)  "Because the dependency scheme is based on the law's strong preference for maintaining family relationships whenever possible, . . . [¶] . . . the risk of detriment must be substantial, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*Yvonne W., supra*, 165 Cal.App.4th at p. 1400, quoting *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 788.)  The standard for showing detriment is "'a fairly high one.  It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.'" (*David B. v. Superior Court, supra*, 123 Cal.App.4th at p. 789.)  Until services are terminated at the final review hearing, "reunification is the goal and [a parent] is entitled to every presumption in favor of having [his child]

released to his custody." (*Id.* at p. 788; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 310 ["[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over the child's need for stability and permanency"].)

We review the record for substantial evidence to support the court's finding of a substantial risk of detriment. (*Yvonne W., supra*, 165 Cal.App.4th at p. 1400; *In re B.S.* (2012) 209 Cal.App.4th 246, 252.) We draw all reasonable inferences from the evidence to support the findings and orders of the dependency court, and review the record in the light most favorable to the court's determinations. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Father contends that his incarceration was the only basis cited by the juvenile court for its finding of detriment and that "incarceration, without more, is not in and of itself detrimental if the parent can arrange appropriate care for the child." (See *In re S. D.* (2002) 99 Cal.App.4th 1068, 1077 [a parent cannot lose custody of a child due solely to incarceration]; see also *In re Isayah C.* (2004) 118 Cal.App.4th 684, 700 [the juvenile dependency system has no jurisdiction to intervene "when an incarcerated parent delegates the care of his or her child to a suitable caretaker" and there is no other basis for jurisdiction under section 300  Because father had made arrangements for R. to remain with paternal aunt while father was incarcerated, father argues there was no evidence to support the trial court's conclusion that returning R. to his custody would be detrimental to the child.

We are not persuaded by father's narrow interpretation of the juvenile court's order. Father cites to the court's references to his incarceration and argues therefore that the court relied solely on the fact that he was in jail, and not at home, as the basis for a

22

finding of detriment. This argument ignores the facts underlying the incarceration, namely, that father was arrested for committing a violent assault on his girlfriend, in which he punched and choked her so severely that she feared for her life. Counsel for DCFS and for R. both argued that the underlying incident, not the incarceration, was a sufficient basis to deny custody to father. In particular, DCFS cited to the prior allegations of domestic violence and father's continuing posture of denial and victim blaming, despite pleading guilty to the battery, as evidence that despite his completion of a lengthy domestic violence course, father continued to pose a danger to R.'s safety. The court also indicated that it was "very concerned" with the fact that father had pled guilty to a felony charge of domestic battery by strangulation and was incarcerated as a result, concluding that this development posed a substantial risk to R. Although father completed his case plan and his extended visits with R. were going well, his act of violence against a girlfriend under the circumstances was substantial evidence demonstrating his inability to benefit from the services designed to address his underlying issues, placing R. at risk of harm in his care.[4]

Father's reliance on cases rejecting dependency jurisdiction based only on a parent's incarceration is therefore misplaced. In these cases, the issue was a risk of detriment stemming from the fact of incarceration, not the underlying crime. (See *In re S.D., supra*, 99 Cal.App.4th at p. 1077 [holding that jurisdiction may

_____

[4]DCFS also argues that father failed to "make substantive progress in his programs." However, the juvenile court expressly rejected this argument in finding that father had been in compliance with his case plan prior to the domestic violence incident.

23

be based on a parent's incarceration only where that parent is unable to arrange for the child's care]; *In re Isayah C., supra,* 118 Cal.App.4th at p. 700; *In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1402 ["'[G]o to prison, lose your child'" is not an appropriate legal maxim].)  Here, on the other hand, the court based its finding on father's violent domestic battery, resulting in his incarceration, not the fact of incarceration alone.  Thus, we find that the court sufficiently identified the factual basis for its determination and that determination was supported by substantial evidence of a risk of detriment to R. from a home-of-parent order at the time of the 18-month review hearing.

II.    *No Abuse of Discretion in Terminating Services or Ordering Monitored Visitation*

Father also contends the juvenile court erred by failing to continue father's reunification services for an additional six months, as it did with mother, and denying father's request for unmonitored visitation.  We find no abuse of discretion.

"Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible.'" (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787 (*Elizabeth R.*), quoting *In re Rebecca H.* (1991) 227 Cal.App.3d 825, 843.)  "To achieve the goal of preserving the family whenever possible, the Legislature required the county child welfare departments to develop and implement family reunification plans and required the courts to monitor those plans through periodic review." (*Ibid.*, citing §§ 319; 361.5, subd. (a).)  On the other hand, the "cutoff date for fostering family reunification is the 18-month status review," after which point the "child's need for stability and security within a definitive time frame becomes paramount." (*Ibid.*)  "At this hearing, the court must return

children to their parents and thereby achieve the goal of family preservation or terminate services and proceed to devising a permanent plan for the children." (*Ibid*., citing § 366.22.)

Reunification services may be extended beyond the 18–month limitation period where the juvenile court finds that exceptional circumstances warrant an extension of services. (*Elizabeth R., supra*, 35 Cal.App.4th at p. 1787, 1798–1799; *In re Carolyn R*. (1995) 41 Cal.App.4th 159, 167 ["[a] court may extend the 18–month maximum for reunification efforts only under very limited circumstances" such as when no reunification plan was ever developed for the parent]; see also § 352 ["[T]he court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor. . . ."].

Father contends the trial court abused its discretion in declining to extend his reunification services beyond the 18-month cutoff. His reliance on *Elizabeth R*., *supra*, 35 Cal.App.4th 1774, is unpersuasive. There, the mother spent all but five months of the 18–month reunification period hospitalized for mental health issues, which limited her ability to participate in reunification services. (*Id*. at p. 1777.) Nevertheless, by the time of the 18–month review hearing, the mother had substantially complied with her case plan and had insisted on visitation as much as possible. (*Id*. at p. 1792.) Believing that its only choice at the 18–month review hearing was to either return the children to the mother's custody or terminate reunification services and order a section 366.26 hearing, the juvenile court terminated reunification services. (*Id*. at p. 1789.) The appellate court disagreed, concluding that the juvenile court had discretion to continue reunification services beyond the 18–month date in rare

instances in which the best interests of the child would be served by a continuance. (*Id*. at pp. 1798–1799.)

Here, the trial court found exceptional circumstances applied to mother, given the challenges she faced as a non-minor dependent and a recent victim of a violent crime. Father faced none of the same challenges. Although he substantially complied with his case plan, he then committed a violent assault on his girlfriend, suggesting that the prior 18 months of services had not created any lasting change. His incarceration resulting from this crime does not establish a right to continued reunification services. As such, the court was well within its discretion to conclude that father was not an exceptional case entitled to an extension of services.

For the same reasons, we conclude that the court did not abuse its discretion in denying father's request to have unmonitored in-person visitation with R. The court's decision to allow unmonitored telephonic visits but require in-person visits to be monitored was reasonable given father's recent conduct.

## DISPOSITION

The juvenile court's order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:



MANELLA, P. J.                                    WILLHITE, J.


26